PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 09-4266
———

IN RE:  PHILADELPHIA NEWSPAPERS, LLC, ET AL.

------------------------------

CITIZENS BANK OF PENNSYLVANIA;
STEERING GROUP OF PREPETITION
SECURED LENDERS,

Appellants
———

No. 09-4349
———

IN RE:  PHILADELPHIA NEWSPAPERS, INC.,

------------------------------

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
CITIZENS BANK OF PENNSYLVANIA;
STEERING GROUP OF PREPETITION
SECURED LENDERS,

Official Committee of Unsecured Creditors,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 09-mc-00178)
District Judge:  Honorable Eduardo C. Robreno

Argued December 15, 2009
Before:  AMBRO, SMITH and FISHER, *Circuit Judges*.

(Filed: March 22, 2010)

David F. Abernethy
Andrew J. Flame
Andrew C. Kassner
Alfred W. Putnam, Jr. (Argued)
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square
Philadelphia, PA  19103
        *Counsel for Appellant / Cross Appellee*
        *Citizens Bank of Pennsylvania*

Alex Freeman
Fred S. Hodara
Abid Qureshi (Argued)
Akin, Gump, Strauss, Hauer & Feld
One Bryant Park

New York, NY 10036

L. Rachel Helyar
Akin, Gump, Strauss, Hauer & Feld
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
*Counsel for Appellant / Cross Appellee*
*Steering Group of Prepetition Secured Lenders*

Kerry A. Brennan
Rick B. Antonoff
Pillsbury, Winthrop, Shaw & Pittman
1540 Broadway, 9th Floor
New York, NY 10036

Elliot Ganz
Loan Syndications and Trading Association
366 Madison Avenue
New York, NY 10017
*Counsel for Amicus Loan Syndications and*
*Trading Association in support of Appellants*

Jonathan N. Helfat
James M. Cretella
Otterbourg, Steindler, Houston & Rosen
230 Park Avenue
New York, NY 10169

Richard M. Kohn
Ronald Barliant
Goldberg Kohn, Ltd.
55 East Monroe Street, Suite 3300

Chicago, IL  60603
  *Counsel for Amicus Commercial Finance*
  *Association in Support of Appellants*

Ann M. Aaronson
Lawrence G. McMichael (Argued)
Dilworth Paxson
1500 Market Street, Suite 2500E
Philadelphia, PA  19102
  *Counsel for Appellees*
  *Philadelphia Newspapers, LLC, et al.*

Ronald S. Gellert
Brya M. Keilson
Gary M. Schildhorn
Eckert, Seamans, Cherin & Mellott
50 South 16th Street
Two Liberty Place, 22nd Floor
Philadelphia, PA  19102

Ben H. Logan, III (Argued)
O'Melveny & Myers
400 South Hope Street, 15th Floor
Los Angeles, CA  90071
  *Counsel for Appellee / Cross Appellant*
  *Official Committee of Unsecured Creditors*

———

OPINION

———

FISHER, *Circuit Judge*.

4

We are asked in this appeal to decide whether Section 1129(b)(2)(A) of the Bankruptcy Code requires that any debtor who proposes, as part of its plan of reorganization, a sale of assets free of liens must allow creditors whose loans are secured by those assets to bid their credit at the auction. Because subsection (iii) of Section 1129(b)(2)(A) unambiguously permits a debtor to proceed with any plan that provides secured lenders with the "indubitable equivalent" of their secured interest in the assets and contains no statutory right to credit bidding, we will affirm the District Court's approval of the proposed bid procedures.

**I.**

Philadelphia Newspapers, LLC (the "Debtors[1]") own and operate the print newspapers the *Philadelphia Inquirer* and *Philadelphia Daily News* and the online publication philly.com. The Debtors acquired these assets in July 2006 for $515 million as part of an acquisition of the businesses by an investor group led by Philadelphia PR executive, Brian Tierney. $295 million of this purchase price came from a consortium of lenders who are collectively the appellants in this action (the "Lenders").[2]

---

[1]The Debtors include PMH Acquisition, LLC; Broad Street Video, LLC; Philadelphia Newspapers, LLC; Philadelphia Direct, LLC; Philly Online, LLC; PMH Holdings, LLC; Broad Street Publishing, LLC; and Philadelphia Media, LLC. PMH is the parent company of all other debtors.

[2]The parties to this appeal are the Steering Group of Prepetition Secured Lenders, Citizens Bank of Pennsylvania as

5

This loan was made pursuant to a Credit and Guaranty Agreement dated June 29, 2006, between the Lenders and the Debtors (the "Loan Agreement"). The Loan Agreement and other loan documents provide that the Lenders hold first priority liens in substantially all of the Debtors' real and personal property. The present value of the loan is approximately $318 million.

The Debtors were in default under covenants in the Loan Agreement as of December 31, 2007, and defaulted on a loan payment in September 2008. All of the Debtors besides PMH Holdings filed voluntary petitions under Chapter 11 of the Bankruptcy Code on February 22, 2009. PMH Holdings, the parent company, filed in June 2009. Currently, the Debtors control their businesses and property as debtors in possession.

On August 20, 2009, the Debtors filed a joint Chapter 11 plan of reorganization (the "Plan"). The Plan provides that substantially all of the Debtors' assets will be sold at a public auction and that the assets would transfer free of liens. Debtors simultaneously signed an asset purchase agreement with Philly Papers, LLC (the "Stalking Horse Bidder"). A majority interest in the Stalking Horse Bidder is held by the Carpenters Pension and Annuity Fund of Philadelphia and Vicinity ("Carpenters") and Bruce Toll. The Carpenters own approximately 30% of the equity in debtor PMH Holdings, LLC and Toll owned approximately 20% of the equity in PMH Holdings, LLC until the day before the asset purchase agreement was signed.

---

their agent, and the Official Committee of Unsecured Creditors.

Under the Plan, the purchase will generate approximately $37 million in cash for the Lenders. Additionally, the Lenders will receive the Debtors' Philadelphia headquarters which the Debtors have valued at $29.5 million, subject to a two-year rent free lease for the entity that will operate the newspapers. The Lenders would receive any cash that is generated by a higher bid at the public auction.[3]

The Debtors filed a motion for approval of bid procedures on August 28, 2009. As part of the motion, the Debtors sought to preclude the Lenders from "credit bidding" for the assets.[4] Instead, the Debtors insisted that any qualified bidder fund its purchase with cash. In their motion to the Court, Debtors stated the basis for their procedures:

---

[3]The plan also establishes a $750,000 to $1.2 million liquidating trust fund in favor of general unsecured trade creditors and provides for a distribution of 3% ownership in the successful purchaser to other general unsecured creditors if the senior lenders waive their deficiency claims. Only the plan treatment of secured lenders is the subject of this appeal, though unsecured lenders assert that they have an interest in the treatment of secured lenders under the Plan because the Lenders have agreed to waive deficiency claims if they are permitted to credit bid. (Official Committee of Unsecured Creditor's Opening Br. 23.)

[4]A credit bid allows a secured lender to bid its debt in lieu of cash.

7

> The Plan sale is being conducted under section 1123(a) and (b) of the Bankruptcy Code, and not section 363 of the Bankruptcy Code. As such, no holder of a lien on any asset of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.

(App. 1291.) Objections to the motion were filed by the Lenders, the Creditors' Committee, the Office of the United States Trustee, the Pension Benefit Guaranty Corporations, and other creditors and debtor pension plans.

On October 8, 2009, the Bankruptcy Court issued an order refusing to bar the lenders from credit bidding. *In re Philadelphia Newspapers, LLC*, No. 09-11204, slip op. (Bankr. E.D. Pa. Oct. 8, 2009). The Court reasoned that while the Plan proceeded under the "indubitable equivalent" prong of § 1129(b)(2)(A)(iii), it was structured as a § 1129(b)(2)(A)(ii) plan sale in every respect other than credit bidding. Reading § 1129(b)(2)(A) in light of other provisions of the Code – specifically §§ 363(k) and 1111(b) – the Court determined that any sale of the Debtors' assets required that a secured lender be able to participate in a sale by credit bidding its debt.

The Bankruptcy Court then approved a revised set of bid procedures without the ban on credit bidding on October 15, 2009. The revised bid procedures specifically allowed the Lenders to bid their secured debt up to $318,763,725. The Bankruptcy Court's ruling was appealed to the District Court.

8

On November 10, 2009, the District Court reversed the Bankruptcy Court. *In re Philadelphia Newspapers, LLC*, No. 09-mc-178, slip op. (E.D. Pa. Nov. 10, 2009) [hereinafter *Dist. Ct. slip op.*]. It disagreed with the Bankruptcy Court's interpretation of § 1129(b)(2)(A) and held that the Code provides no legal entitlement for secured lenders to credit bid at an auction sale pursuant to a reorganization plan.

The District Court relied on the plain language of § 1129(b)(2)(A), which provides three distinct routes to plan confirmation – retention of liens and deferred cash payments under subsection (i), a free and clear sale of assets subject to credit bidding under subsection (ii), or provision of the "indubitable equivalent" of the secured interest under subsection (iii). The Court reasoned that these three routes were independent prongs, separated by the disjunctive "or," and therefore each was sufficient for confirmation of a plan as "fair and equitable" under the Code. Because the right to credit bid was not incorporated into subsection (iii), as it was in subsection (ii), Congress did not intend that a debtor who proceeded under the third prong would be required to permit credit bidding. Instead, subsection (iii) required only that a debtor provide secured lenders with the "indubitable equivalent" of their secured interest in the assets. The District Court pointed out that this broad language served as an "invitation to debtors to craft an appropriate treatment of a secured creditor's claim, separate and apart from the provisions of subsection (ii)." *Dist. Ct. slip op.* at 39. As such, "a plan sale is potentially another means to satisfy this indubitable equivalent standard." *Id.* at 39-40.

9

The District Court's order was appealed to us along with a motion for a stay. We granted the stay on November 17, 2009, pending resolution of this appeal on the merits.

## II.

The District Court had jurisdiction under 28 U.S.C. § 158(a)(3) over the appeal from the Bankruptcy Court,[5] which had jurisdiction under 28 U.S.C. § 157(b). We have jurisdiction under 28 U.S.C. § 158(d).

We exercise plenary review over the District Court's conclusions of law, including matters of statutory interpretation. *In re Tower Air, Inc.*, 397 F.3d 191, 195 (3d Cir. 2005) (citing *In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 282-83 (3d Cir. 2002)). Because the District Court sat as an appellate court to review the Bankruptcy Court's ruling, we review the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof. *Id.* (citing *In re Engel*, 124 F.3d 567, 571 (3d Cir. 1997)).

## III.

Chapter 11 of the Bankruptcy Code strikes a balance between two principal interests: facilitating the reorganization

---

[5]The District Court construed the filing of the appeal as an appropriate motion for leave to appeal pursuant to Fed. R. Bankr. P. 8003(c). This vested the District Court with jurisdiction over the interlocutory order. *See Dist. Ct. slip op.* at 11-13.

10

and rehabilitation of the debtor as an economically viable entity, and protecting creditors' interests by maximizing the value of the bankruptcy estate. *See In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)). In furtherance of those objectives, the Code permits a debtor preparing a Chapter 11 reorganization plan to "provide adequate means for the plan's implementation" including arranging for the "sale of all or any part of the property of the estate, either subject to or free of any lien[.]" 11 U.S.C. § 1123(a)(5)(D). We are asked in this appeal to determine what rights a secured lender has when its collateral is sold pursuant to § 1123(a)(5)(D).

As a starting point for our analysis, we note that the "plan sale" authorized by § 1123(a)(5)(D) contains no explicit procedures for the sale of assets that secure debts of the estate. Lacking direct authority, we look to the plan confirmation provision of the Code, § 1129(b), to determine what requirements the court will later have to find are satisfied in order to confirm the plan, including the asset sale. The meaning of § 1129(b), and what rights it confers on secured lenders as a matter of law, is thus the central question in this appeal. Because § 1129(b) unambiguously permits a court to confirm a reorganization plan so long as secured lenders are provided the "indubitable equivalent" of their secured interest, we will affirm the District Court.

The Lenders offer three principal arguments in support of their right to credit bid at the auction of the assets securing their loan: First, they contend that the plain language of

11

§ 1129(b)(2)(A), in light of applicable canons of statutory interpretation, requires that all sales of assets free and clear of liens must proceed under subsection (ii) of that provision, which includes the right to credit bid. Second, they argue that subsection (iii) calling for the "indubitable equivalent" of a lender's secured interest is ambiguous, requiring resort to other provisions of the Code that purportedly confirm the Lenders' right to credit bid. Finally, they argue that denying secured lenders a right to credit bid is inconsistent with other provisions of the Bankruptcy Code. We will address each argument in turn.

**A.** **The Plain Meaning of Section 1129(b)(2)(A) Permits a Debtor to Conduct an Asset Sale Under Subsection (iii) Without Allowing Secured Lenders to Credit Bid**

It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal citations and quotations omitted); *see also Price v. Del. State Police Fed. Credit Union*, 370 F.3d 362, 368 (3d Cir. 2004) ("We are to begin with the text of a provision and, if its meaning is clear, end there."). Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history. *See AT&T, Inc. v. F.C.C.*, 582 F.3d 490, 498 (3d Cir. 2009).

In determining whether language is unambiguous, we "read the statute in its ordinary and natural sense." *Harvard Secured Creditors Liquidation Trust v. I.R.S.*, 568 F.3d 444, 451 (3d Cir. 2009). A provision is ambiguous only where the disputed language is "reasonably susceptible of different interpretations." *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005) (quoting *Nat'l R.R. Passenger Corp. v. Atchinson Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 473 n.27 (1985)).

With that framework in mind, we turn to the language of § 1129(b)(2)(A). Section 1129(b) provides circumstances under which a reorganization plan can be confirmed over the objection of secured creditors – a process referred to as a "cramdown" because the secured claims are reduced to the present value of the collateral, while the remainder of the debt becomes unsecured, forcing the secured creditor to accept less than the full value of its claim and thereby allowing the plan to be "crammed down the throats of objecting creditors." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990) (Easterbrook, J.). Section 1129(b)(1) requires the court to assess whether the proposed treatment of the secured claims is "fair and equitable." 11 U.S.C. § 1129(b)(1).

Section 1129(b)(2)(A) provides three circumstances under which a plan is "fair and equitable" to secured creditors:

> (A)    With respect to a class of secured claims, the plan provides--

(i)    (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

(ii)    for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; **or**

(iii)    for the realization by the holders of the indubitable equivalent of such claims.

14

11 U.S.C. § 1129(b)(2)(A)(i)-(iii) (emphasis added).

The three subsections of § 1129(b)(2)(A) each propose means of satisfying a lender's lien against assets of the bankruptcy estate. Subsection (i) provides for the transfer of assets with the liens intact and deferred cash payments equal to the present value of the lender's secured interest in the collateral. Subsection (ii) provides for the sale of the collateral that secures a lender free and clear of liens so long as the lender has the opportunity to "credit bid" at the sale (*i.e.*, offset its bid with the value of its secured interest in the collateral) with the liens to attach to the proceeds of the sale.[6] Subsection (iii) provides for the realization of the claim by any means that provides the lender with the "indubitable equivalent" of its claim.

---

[6]The right to credit bid is found in § 363(k) and explicitly incorporated into subsection (ii). Section 363(k) provides:

At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

15

The Lenders concede, as they must, that § 1129(b)(2)(A) is phrased in the disjunctive. The use of the word "or" in this provision operates to provide alternatives – a debtor may proceed under subsection (i), (ii), *or* (iii), and need not satisfy more than one subsection. This approach is consistent with the definitions provided by the Code. Section 102(5) provides that 'or' is not exclusive[.]" 11 U.S.C. § 102(5). The statutory note to § 102(5) further explains that "if a party 'may do (a) or (b)', then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." 11 U.S.C. § 102 hist. n. (West 2004) (Revision Notes and Legislative Reports); *see also* H.R. Rep. No. 95-595, at 315 (1977) *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6272; S.Rep. No. 95-989, at 28 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5814. Thus, any doubt as to whether subsections (i), (ii), and (iii) were meant to be alternative paths to meeting the fair and equitable test of § 1129(b)(2)(A) is resolved by the Bankruptcy Code itself, and courts have followed this uncontroversial mandate. *See*, *e.g.*, *Pacific Lumber*, 584 F.3d at 245 (affirming "the obvious proposition that because the three subsections of § 1129(b)(2)(A) are joined by the disjunctive 'or,' they are alternatives"); *Wade v. Bradford*, 39 F.3d 1126, 1130 (10th Cir. 1994) ("These requirements [of § 1129(b)(2)(A)] are written in the disjunctive, requiring the plan to satisfy only one before it could be confirmed over creditor's objection."); *In re Brisco Enters., Ltd. II*, 994 F.2d 1160, 1168 (5th Cir. 1993) (holding that the court "has not transformed the 'or' in 1129(b)(2)(A) to an 'and'"); *accord Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 50 (E.D. Pa. 1996) ("Courts consider Congresses' use of the disjunctive 'or' between subsections (i), (ii), and (iii) indicative

16

of Congressional intent that only one of the three subsections need be satisfied in order to find a plan fair and equitable.").

Though the ordinary operation of the word "or" is not genuinely disputed among the parties,[7] the Lenders rely on a traditional canon of statutory interpretation – that the specific term prevails over the general term – to argue that a plan sale of

_____

[7]We do note, with some confusion, our dissenting colleague's discussion of the "exclusive" nature of "or" under certain circumstances. *See Dissent op.* Part II.B. We readily concede that there are circumstances where the enumerated options, though separated by "or," necessarily preclude the selection of both – such as where a statute calls for distinct treatments "before" or "after" a specified event. *See*, *e.g.*, 11 U.S.C. § 365(g)(2)(B)(i)-(ii). We also agree that a list of three options, separated by "or," creates a type of exclusivity in that it does not permit the selection of a fourth non-enumerated option. *See*, *e.g.*, *Williams v. Tower Loan of Miss., Inc. (In re Williams)*, 168 F.3d 845, 847-48 (5th Cir. 1999) (holding that where Congress has provided three permissible treatments of secured claims under 11 U.S.C. § 1325(a)(5) the parties may not construct a fourth extra-statutory option). None of these observations, however, inform our analysis here. Section 1129(b)(2)(A) provides three treatments of secured claims, none of which facially preclude the selection of any one treatment (as in the case of a statute addressing "before" and "after"). The Debtors here seek to elect one of those enumerated treatments, subsection (iii), not invent a fourth option not intended by Congress. We thus fail to see how an "exclusive" reading of "or" aids the Lenders' position in this case.

17

assets free and clear of liens must comply with the more specific requirements of subsection (ii). In other words, the proposed treatment of collateral determines which of the § 1129(b)(2)(A) alternatives is applicable. Under this interpretation, any Chapter 11 plan proposing the transfer of assets encumbered by their original liens must proceed under subsection (i), any plan proposing the free and clear sale of assets must proceed under subsection (ii), and only those plans proposing a disposition not covered by subsections (i) and (ii), most notably the substitution of collateral, may then proceed under subsection (iii). This reasoning dictates that, because the Plan includes a sale of collateral free and clear of liens, the Lenders would have a statutory right to credit bid pursuant to the express terms of subsection (ii).

It is "a well-settled maxim that specific statutory provisions prevail over more general provisions." *In re Combustion Eng'g*, 391 F.3d 190, 237 n.49 (3d Cir. 2004). In *Combustion Engineering*, we applied this principle to hold that the broad equitable authority granted to bankruptcy courts by § 105(a) to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), could not be used to circumvent the express limitations of § 524(g), which enumerated limited circumstances under which the court could enjoin suits against non-debtors whose asbestos liabilities were derivative of the debtor's, 11 U.S.C. § 524(g)(4)(a)(ii). Accordingly, we vacated an injunction precluding suit against non-debtors whose liabilities did not fall within those articulated in § 524(g), notwithstanding the court's more general equitable authority under § 105(a).

18

However, the Supreme Court has cautioned that "[t]o apply a canon properly one must understand its rationale." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). The principle motivating the outcome in *Combustion Engineering* was "a warning against applying a general provision when doing so would undermine *limitations* created by a more specific provision." 391 F.3d at 237 n.49 (quoting *Varity Corp.*, 516 U.S. at 511) (emphasis added). Thus, the principle is only applicable here if we find that the specificity of subsection (ii) operates as a limitation on the broader language in subsection (iii). We believe it does not.

The Supreme Court has addressed a nearly identical argument, albeit under a different statutory scheme, and held that a specific enumeration followed by a broader "catchall" provision does not require application of the more specific provision. *Varity Corp.*, 516 U.S. at 511-12. The question in *Varity Corp.* was whether § 502(a)(3) of ERISA authorized individual relief when plan beneficiaries sued for breach of fiduciary duty. ERISA's remedial provision provides, in relevant part:

> Sec. 502. (a)  A civil action may be brought- . . .
>
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; [or]
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the

19

plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a). Section 1109, describing the relief available under subsection (2), is titled "Liability for Breach of Fiduciary Duty" and provides that any individual who breaches a fiduciary duty is personally liable to "make good to such plan any losses to the plan." 29 U.S.C. § 1109(a). Prior Supreme Court analysis made clear that this language limited relief to restitution to the plan, and thereby precluded individual relief under § 1109(a). *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985). Plaintiffs, as participants and beneficiaries of the plan, sued Varity under subsection (3) alleging breach of fiduciary duty and seeking individual equitable relief.

The argument advanced by Varity mirrored the argument advanced by the Lenders here: Varity argued that, because subsection (2) specifically pertains to breaches of fiduciary duty, and because it incorporates the § 1109(a) prohibition on individual recovery, the plaintiffs could not avail themselves of the more general subsection (3) when their suit was premised on breach of fiduciary duty. To permit as much, Varity argued, was to allow a circumvention of subsection (2)'s restrictions on individual relief.

The Supreme Court rejected this argument. Considering the application of the canon "the specific governs the general," the Court reasoned that it only applied where the more specific

20

provision clearly placed a limitation on the general. 516 U.S. at 511. The Court observed no such limitation in the narrower provision of subsection (2):

> To the contrary, one can read [§1109] as reflecting a special congressional concern about plan asset management without also finding that Congress intended that section to contain the exclusive set of remedies for every kind of fiduciary breach. . . . Why should we not conclude that Congress provided yet other remedies for yet other breaches of other sorts of fiduciary obligations in another, "catchall" remedial section?

*Id.* at 511-12. The plaintiffs were thus permitted to proceed under subsection (3) and seek individual equitable relief for the alleged breach of fiduciary duty.

The Court's reasoning in *Varity Corp.* helps to resolve our inquiry into the relationship between the subsections of § 1129(b)(2)(A). Although subsection (ii) specifically refers to a "sale" and incorporates a credit bid right under § 363(k), we have no statutory basis to conclude that it is the only provision under which a debtor may propose to sell its assets free and clear of liens. While the proposed disposition of assets in subsection (ii) may reflect "a special congressional concern" about the free and clear transfer of collateral that secures a loan, *Varity Corp.*, 516 U.S. at 511, this does not lead inexorably to the conclusion that Congress meant for subsection (ii) to be the exclusive means through which such collateral is transferred.

21

Just as the Court in *Varity Corp.* concluded that the "catchall" provision permitted "yet other remedies for yet other breaches of other sorts of fiduciary obligations," 516 U.S. at 512, it is apparent here that Congress' inclusion of the indubitable equivalence prong intentionally left open the potential for yet other methods of conducting asset sales, so long as those methods sufficiently protected the secured creditor's interests. *Accord In re CRIIMI MAE, Inc.*, 251 B.R. 796, 807 (Bankr. D. Md. 2000) ("11 U.S.C. § 1129(b)(2)(A) plainly indicates that subsections (i), (ii) and (iii) are to be treated as distinct alternatives. As a result, the provisions are not in conflict and the ['specific governs the general'] rule of construction is inapplicable.").[8]

---

[8]The Court's reasoning in *Varity Corp.* also makes abundantly clear that application of a broader provision, which the court self-terms a "catchall," 516 U.S. at 512, does not automatically render narrower provisions superfluous. Such would only be the case where the narrower provision facially precludes application of that broader provision. Though our dissenting colleague would hold otherwise, permitting a sale of assets under subsection (iii) is not "contrary to the express terms" of subsection (ii), *dissent op.* Part III.A.2. Subsection (ii) provides a specific, though non-exclusive, route to a "fair and equitable" plan of reorganization. Subsection (iii) provides a more open-ended directive towards the same goal. The selection of one option does not facially negate the other (as in the case of provisions directing conduct "before" or "after,"*see supra* note 7). Rather, the dissent suggests that the proposed plan in this case – a free and clear sale of assets under the "indubitable equivalent" prong – will have the effect of denying

The Lenders' argument in this regard elevates form over substance. A proposed plan of reorganization, even one that fully compensates lenders for their secured interest, would necessarily fail under their reading if the plan proposed a free and clear asset sale without complying with the additional requirements of subsection (ii). Reading the statute in this manner significantly curtails the ways in which a debtor can fund its reorganization – an outcome at odds with the fundamental function of the asset sale, to permit debtors to "provide adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5)(D); *see also Varity Corp.*, 516 U.S. at 513 (rejecting a limited reading of the "catchall" provision because "ERISA's basic purposes favor a reading of the third subsection that provides the plaintiffs with a remedy").

---

secured creditors the established "fair and equitable" treatment of subsection (ii), thus demonstrating statutory conflict. This argument is not directed at the statute; it is directed at the ultimate outcome. The question of whether a particular asset sale is "fair and equitable" is a question for plan confirmation and cannot be answered at this stage by manufacturing extra-textual statutory constraints. *See Pacific Lumber*, 584 F.3d at 246 ("Clause (iii) does not render Clause (ii) superfluous facially or as applied to the MRC/Marathon plan. Although a credit bid option might render Clause (ii) imperative in some cases, it is unnecessary here because the plan offered a cash payment to the Noteholders. Clause (iii) thus affords a distinct basis for confirming a plan if it offered the Noteholders the 'realization . . . of the indubitable equivalent of such claims.'").

The Fifth Circuit in *Pacific Lumber*, 584 F.3d 229, reached this same conclusion. The transaction in *Pacific Lumber* was an inside transfer of assets to the reorganized entities, free and clear of the liens, which the Fifth Circuit determined was a sale under the Code. *Id.* at 245. In exchange, the secured lenders received the full cash equivalent of their undersecured claims but were not permitted to bid their credit to attain possession of the assets. The secured lenders objected to the confirmation of the plan based on their inability to credit bid.

In analyzing the confirmation, the Fifth Circuit required the creditors to "do more than show that Clause (ii) theoretically applied to this transaction. They have to demonstrate its exclusive applicability." *Id.* The court reasoned that the creditors could not demonstrate the exclusive application of subsection (ii) because the three subsections of § 1129(b)(2)(A) were "alternatives" and "not even exhaustive" of the ways in which a debtor might satisfy the "fair and equitable" requirement. *Id.* Thus, even though the debtors' proposed asset transfer was a "sale" under the Code, the court did not limit the debtors to confirmation under subsection (ii). *Id.* at 245-46. Rather, the court looked to whether the transaction satisfied the requirements of subsection (iii). *Id.* at 246. Because the proposed cash payout of the value of the collateral provided the secured lenders with the "indubitable equivalent" of their claims, the plan was confirmable under subsection (iii) notwithstanding its structure as an asset sale and the exclusion of the secured lenders' right to credit bid. *Id.* at 246-47.

The court's approach in *Pacific Lumber* focuses on fairness to the creditors over the structure of the cramdown.

24

Under the scheme proposed by the Lenders, because the *Pacific Lumber* plan involved a sale of assets, the debtor would be *required* to proceed under subsection (ii); and, if it could not meet the subsection (ii) requirements, then the plan could not be confirmed. The Fifth Circuit instead took the more flexible approach, consistent with the disjunctive nature of the statute, that a plan could be confirmed so long as it met any one of the three subsections' requirements, regardless of whether the plan's structure more closely resembled another subsection. *Id.*; *accord Corestates Bank*, 202 B.R. at 50 (holding that a plan permitting retention of liens on some but not all collateral could not proceed under subsection (i) and remanding for consideration of whether the plan provided the indubitable equivalent under subsection (iii)); *CRIIMI MAE*, 251 B.R. at 806 (rejecting argument that "no plan that contemplates the sale of collateral of a dissenting class of secured claims can be found 'fair and equitable' unless it complies with section 1129(b)(2)(A)(ii)").

This approach recognizes that Congress' use of "or" in § 1129(b)(2)(A) was not without purpose. A plan of reorganization cannot be confirmed over the objection of secured lenders unless it is "fair and equitable." 11 U.S.C. § 1129(b)(1). To guide courts in interpreting that standard, Congress provided examples: a transfer of lien-encumbered assets with deferred cash payments, a free and clear sale of assets subject to credit bidding, or any other disposition that provides lenders with the "indubitable equivalent" of their secured interest. The final option elevates fair return to the lenders over the methodology the debtor selects to achieve that return, and invites debtors "to craft an appropriate treatment of

25

a secured creditor's claim, separate and apart from the provisions of subsection (ii)." *Dist. Ct. slip op.* at 39. We have no statutory basis for concluding that such flexibility, consistent with both the language and purpose of the Code, should be curtailed.

**B.     Subsection (iii)'s "Indubitable Equivalent" Language Unambiguously Excludes the Right to Credit Bid**

Next, the Lenders argue that the term "indubitable equivalent" is ambiguously broad and we should therefore resort to other canons of statutory construction to determine whether a sale of collateral in the absence of credit bidding can ever provide the "indubitable equivalent" of the secured interest.

The term "indubitable equivalent," while infrequently employed in popular parlance, was not plucked from the congressional ether. Judge Learned Hand first coined the phrase "indubitable equivalent" in his opinion *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935). In that opinion, Judge Hand rejected a debtor's offer to repay the balance of a secured debt in a balloon payment ten years after plan confirmation with interim interest payments but no requirements to protect the collateral. Judge Hand reasoned that, under the Bankruptcy Act of 1898, a secured creditor could not be deprived of his collateral "unless by a substitute of the most indubitable equivalence." *Id.* This phrase was later added to the Bankruptcy Code. The phrase, as the Fifth Circuit noted, is "rarely explained in caselaw, because most contested reorganization plans follow familiar paths outlined in Clauses (i) and (ii)." *Pacific Lumber*, 584 F.3d at 246.

26

As a general matter of statutory construction, a term in a statute is not ambiguous merely because it is broad in scope. *See Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). In employing intentionally broad language, Congress avoids the necessity of spelling out in advance every contingency to which a statute could apply. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (holding that the fact that a statute can be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.").

Though broad, the phrase "indubitable equivalent" is not unclear. Indubitable means "not open to question or doubt," *Webster's Third New Int'l Dictionary* 1154 (1971), while equivalent means one that is "equal in force or amount" or "equal in value," *id.* at 769. The Code fixes the relevant "value" as that of the collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable equivalent" of the secured claim); *id.* § 506(a) (defining a secured claim as "the extent of the value of such creditor's interest in the estate's interest in such property"). Thus the "indubitable equivalent" under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral.

Further, the scope of the "indubitable equivalent" prong is circumscribed by the same principles that underlie subsections (i) and (ii), specifically, the protection of a fair return to secured lenders.[9] As the Fifth Circuit reasoned:

---

[9]The dissent misunderstands this point. *See Dissent op.* Part III.A.1. Subsections (i) and (ii) do not, as noted *supra*,

27

> Congress did not adopt indubitable equivalent as a capacious but empty semantic vessel. Quite the contrary, these examples focus on what is really at stake in secured credit: repayment of principal and the time value of money. Clauses (i) and (ii) explicitly protect repayment to the extent of the secured creditors' collateral value and the time value compensating for the risk and delay of repayment. Indubitable equivalent is therefore no less demanding a standard than its companions.

*Pacific Lumber*, 584 F.3d at 246.

Applying this standard, courts have concluded in a variety of circumstances that a debtor has provided the "indubitable equivalent" of a secured lender's claim. *See id.* at 246 (holding a cash payout satisfied the "indubitable equivalent" prong); *In re Sun Country*, 764 F.2d 406, 409 (5th Cir. 1985) (holding 21 notes secured by 21 lots of land was the "indubitable equivalent" of a first lien on a 200 acre lot); *accord CRIIMI MAE*, 251 B.R. at 807-08 (holding exchange of collateral satisfied the "indubitable equivalent" prong); *see also* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down under the Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 156 (1979) (hypothesizing that "[a]bandonment of the collateral to the class would satisfy [indubitable equivalent], as would a replacement lien on similar collateral").

---

operate as limitations on subsection (iii). Rather, the requirement that the disposition of assets is "fair and equitable" to secured lenders acts as an equal limitation on *all* subsections.

Because we decline to hold that subsection (iii) is ambiguous, the Lenders may only assert a right to credit bid under subsection (iii) if that right is contained in the plain language of the statute. Section 1129(b)(2)(A)(iii) states that a plan of reorganization is fair and equitable if it provides "for the realization by the holders of the indubitable equivalent of [allowed secured] claims." Subsection (iii), unlike subsection (ii), incorporates no reference to the right to credit bid created in § 363(k). A plain reading of § 1129(b)(2)(A)(iii) therefore compels the conclusion that, when a debtor proceeds under subsection (iii), Congress has provided secured lenders with no right to credit bid at a sale of the collateral.

The Lenders counter this conclusion by arguing that, even if subsection (iii) contains no explicit right to credit bid, that right is necessary to providing secured lenders with the "indubitable equivalent" of their claims. This argument is premised on our decision in *In re SubMicron Systems Corp.*, 432 F.3d 448 (3d Cir. 2006), where we held that credit bidders in a § 363(b) sale could bid up to the full value of their loan, and that the amount of the credit bid became the value of the lender's secured interest in the collateral. In light of *SubMicron*, the Lenders ask us to hold that a secured lender who is not allowed to credit bid can never receive the "indubitable equivalent" of its secured interest because its credit bid sets the value of the collateral.

The Lenders' argument is well-taken that determining whether a secured lender has received the full value of its interest in the collateral is more complicated when the collateral undersecures the debt. To illustrate the distinction: A lender

29

who makes a loan of $100 secured by a lien against a truck worth $500 indisputably has a secured interest of $100. If the value of the truck depreciates such that, at the time of bankruptcy, the truck is worth less than $100, then the lender has a secured interest only up to the "value" of the truck. The source of this "value" is central to this dispute to the extent that it informs whether a lender has received the indubitable equivalent of its secured interest.

*SubMicron* is consistent with our analysis in this case. Our holding that a credit bid sets the value of a lender's secured interest in collateral does not equate to a holding that a credit bid must be the successful bid at a public auction. Rather, a court is called at plan confirmation to determine only whether a lender has received the "indubitable equivalent" of its secured interest. Logically, this can include not only the cash value generated by the public auction, but other forms of compensation or security such as substituted collateral or, as here, real property. In other words, it is the plan of reorganization, and not the auction itself, that must generate the "indubitable equivalent." For this reason, the District Court noted that Lenders "retain the right to argue at confirmation, if appropriate, that the restriction on credit bidding failed to generate fair market value at the Auction, thereby preventing them from receiving the indubitable equivalent of their claim." *Dist. Ct. slip op.* at 55.

Although the Lenders contend that our approach here is anomalous, the case law favors the Debtors. While the reasoning in the myriad cases touching upon this issue is admittedly inconsistent, no case cited by the Lenders reaches the conclusion they advance here: that credit bidding is required

30

when confirmation is sought under subsection (iii). *See*, *e.g.*, *In re River Village*, 181 B.R. 795, 805 (E.D. Pa 1995) (permitting credit bidding in a § 363(b) pre-confirmation sale but confirming the reorganization under subsection (i)); *In re California Hancock*, 88 B.R. 226, 230 (9th Cir. B.A.P. 1988) (requiring credit bidding where confirmation was sought under subsection (i)). Rather, most cases addressing the right to credit bid have concluded, in keeping with the express language of the statute, that such right arises when confirmation is sought under subsection (ii). *See*, *e.g.*, *In re Kent Terminal*, 166 B.R. 555, 566-67 (Bankr. S.D.N.Y. 1994) (holding that "the lienholder has the unconditional right to bid in its lien" under subsection (ii)).

On the other hand, the Fifth Circuit has specifically addressed whether a lender had a right to credit bid under subsection (iii) and concluded that it did not. *See Pacific Lumber*, 584 F.3d at 246. As discussed above, the court in *Pacific Lumber* confirmed a sale of assets at private auction by determining that the cash payout to the noteholders provided the "indubitable equivalent" of their secured interest in the assets, notwithstanding a provision barring secured lenders from credit bidding. 584 F.3d at 246. Though *Pacific Lumber* was a plan confirmation case, its holding on the threshold requirements of § 1129(b)(2)(A) speaks to our inquiry here – specifically, that a debtor may proceed with a sale under subsection (iii) without permitting secured lenders to credit bid. *Accord CRIIMI MAE*, 251 B.R. at 807 (reasoning that § 1129(b)(2)(A) permitted a debtor to proceed with a sale free and clear of liens under subsection (ii) or (iii), and that because only subsection (ii) required credit bidding, a sale that proceeded under subsection (iii) need only satisfy the "indubitable equivalent" requirement).

31

This rule, which proceeds from the plain language of the statute, is not akin to guaranteeing plan confirmation. We are asked here not to determine whether the "indubitable equivalent" would necessarily be satisfied by the sale; rather, we are asked to interpret the requirements of § 1129(b)(2)(A) as a matter of law. This distinction is critical. The auction of the Debtors' assets has not yet occurred. Other public bidders may choose to submit a cash bid for the assets. The value of the real property that the Lenders will receive, in addition to cash, under the terms of the proposed plan has not yet been established. And the secured claim itself has not yet been judicially valued under § 506(a).[10] We are simply not in a position at this stage

_____

[10]Section 506(a) bifurcates claims into secured and unsecured claims based on judicial valuation of the collateral securing the claim. The statute directs that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). Prior to plan confirmation the Lenders' present loan value will be bifurcated into a secured claim – based on valuation of the collateral – and an unsecured claim for the deficiency. The "indubitable equivalent" standard is tied only to the value of the secured claim. Thus, any present comparison between the $295 million loan and the value of the Stalking Horse Bid is irrelevant; the Lenders are only entitled to recover the portion of the loan that is presently secured by the value of the collateral. For this reason, we decline to engage in the dissent's attempt to assess the "value" of the proposed plan relative to the amount of the original loan. *See Dissent op.* Part IV. This comparison is

to conclude, as a matter of law, that this auction cannot generate the indubitable equivalent of the Lenders' secured interest in the Debtors' assets. We approve the proposed bid procedures with full confidence that such analysis will be carefully and thoroughly conducted by the Bankruptcy Court during plan confirmation, when the appropriate information is available.

Finally, in holding that § 1129(b)(2)(A) is not ambiguous, we are cognizant of our dissenting colleague's strenuous admonition that two esteemed courts below have reached opposite, and presumably "reasonable," interpretations of this statutory language. *Dissent op.* Part II. However, as Justice Thomas has observed, "[a] mere disagreement among litigants over the meaning of a statute does not itself prove ambiguity; it usually means that one of the litigants is simply wrong." *Bank of A. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 461 (1991) (Thomas, J., concurring). The same is true of disagreements among courts. *See*, *e.g.*, *In re Ford*, 574 F.3d 1279, 1293 (10th Cir. 2009) ("Case law (including this very opinion) shows that courts can reasonably disagree on the meaning of the term under various state laws. But the plain language of [this provision] is clear, making resort to its legislative history unnecessary and potentially misleading."). We decline to hold that a statutory provision is ambiguous as a matter of law merely because two admittedly well-reasoned opinions below reached opposite conclusions. Were this the case, this Court would never be permitted to reverse on plain language grounds a district court's holding that a provision is ambiguous because the district court's reasonable

both premature and misleading.

disagreement would itself create an ambiguity.  Clearly this is not the case.  *See*, *e.g.*, *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 398 (3d Cir. 1999) (reversing district court holding, following California Bankruptcy Court opinion, that 11 U.S.C. § 503(b)(4) was ambiguous, holding instead that statutory language was subject to only one reasonable interpretation).

Because the language of § 1129(b)(2)(A) is unambiguous – both as to the non-exclusive enumeration of permissible treatments of secured claims, and the inclusion of a broad but not meaningless option to provide the "indubitable equivalent" of secured interests – we will affirm the District Court.

## C.    The Plain Meaning of § 1129(b)(2)(A) is Not Inconsistent with Congressional Intent

Our opinion could stop with a plain language analysis, however, we are cognizant that the Supreme Court has recognized a narrow exception to the plain meaning rule in the "rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (permitting a "restricted rather than a literal or usual meaning of [statutory] words where acceptance of that meaning . . . would thwart the obvious purpose of the statute"); *Morgan v. Gay*, 466 F.3d 276, 277-78 (3d Cir. 2006) (noting "in that rare instance where it is uncontested that legislative intent is at odds with the literal terms of the statute, then a court's primary role is to effectuate the intent of Congress

even if a word in the statute instructs otherwise").[11]  Generally, where the text of a statute is unambiguous, the statute should be enforced as written and "[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." *United States v. Albertini*, 472 U.S. 675, 680 (1985) (internal quotation omitted).  We find no extraordinary showing of contrary intent that warrants deviation from the plain text of the statute.

The bulk of the Lenders' arguments, as well as the weight of the Bankruptcy Court's reasoning, rely on the way in which §§ 1111(b) and 363(k) inform a lender's right to credit bid at the sale of the debtor's assets.  The Lenders argue that the Code guarantees a secured lender one of two rights – either the right to elect to treat their deficiency claims as secured under § 1111(b) or the right to bid their credit under § 363(k).  Because the Lenders are statutorily precluded from making a § 1111(b) election,[12] they contend that they must be afforded the right to credit bid at the auction.

---

[11]In addition, we believe it is necessary to at least answer the points raised by the Lenders and relied upon by our colleague in his well-written dissent.

[12]Recourse lenders are exempted from making a § 1111(b) election.  *See* 11 U.S.C. § 1111(b)(1)(B)(ii) (exempting secured lenders from exemption if "the holder of a [secured claim] has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan").

35

A summary of the relevant statutory provisions informs our analysis. Section 363 establishes certain rights and procedures in connection with, *inter alia*, the sale of debtor assets. Section 363(b) provides that the trustee "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Such a sale is subject to the secured lender protections of § 363(k), which provide that:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). As discussed above, this is commonly referred to as the right to "credit bid" and is incorporated by reference into § 1129(b)(2)(A)(ii).

Section 1111(b) covers the treatment of certain claims and interests of bankruptcy creditors, and provides unique protections to undersecured lenders.[13] Specifically

---

[13]The full text of § 1111(b) reads:

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder

36

of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless–

> (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

> (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if–

> (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

> (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such

§ 1111(b)(1)(A) is an exception to the general rule that creditors who do not have recourse to the debtor are entitled to nothing more than the realization of their collateral. Under § 1111(b), Congress provided the option for nonrecourse creditors to have their deficiency claims treated as secured debt. This is a deviation from the process provided for in § 506(a), under which the claim of an undersecured creditor is divided into: (1) a secured claim equal to the court-determined value of the collateral securing the claim, and (2) an unsecured claim for the deficiency. 11 U.S.C. § 506(a)(1). A nonrecourse creditor who makes a § 1111(b) election would be permitted to treat its deficiency claim as secured. 11 U.S.C. § 1111(b)(2).

The § 1111(b) election is not available to recourse creditors when the property is sold under § 363 or under a plan of reorganization. 11 U.S.C. § 1111(b)(1)(B)(ii). As recourse creditors whose collateral is being sold under a plan, the Lenders are not eligible to make a § 1111(b) election. They argue that the exemption of secured recourse creditors from the § 1111(b) election is limited to situations in which they have the opportunity to credit bid: specifically, a § 363 sale, under which their right to credit bid is preserved by § 363(k), and a plan of reorganization, under which their right to credit bid is incorporated into § 1129(b)(2)(A)(ii). The import of these two exceptions, according to the Lenders, is that Congress clearly intended that any sale of collateral – whether under § 363 or a plan of reorganization – would permit credit bidding by secured lenders.

---

claim is a secured claim to the extent that such claim is allowed.

38

This argument fails in light of the plain language and operation of the Code.  As an initial matter, the Code plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid.  The most obvious example arises in the text of § 363(k), under which the right to credit bid is not absolute.  A secured lender has the right to credit bid "unless the court for cause orders otherwise."  11 U.S.C. § 363(k).  In a variety of cases where a debtor seeks to sell assets pursuant to § 363(b), courts have denied secured lenders the right to bid their credit. *See In re Aloha Airlines*, No. 08-00337, 2009 WL 1371950, at *8 (Bankr. D. Haw. May 14, 2009) (determining that "cause exists to deny the credit bid" under § 363(k)); *Greenblatt v. Steinberg*, 339 B.R. 458, 463 (N.D. Ill. 2006) (holding the "bankruptcy court did not err in refusing to allow [a secured creditor] to credit bid"); *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (W.D. Va. 2005) (denying right to credit bid to facilitate "fully competitive" cash auction); *In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) (noting that "there is no absolute entitlement to credit bid").[14]

---

[14]The Lenders argue that the "for cause" exemption under § 363(k) is limited to situations in which a secured creditor has engaged in inequitable conduct.  That argument has no basis in the statute.  A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.  *See*, *e.g.*, 3 Collier on Bankruptcy 363.09[1] ("The Court might [deny credit bidding] if permitting the lienholder to bid would chill the bidding process.").

At the heart of the Lenders' argument is the notion that the combined import of § 1111(b) and § 363(k) is a special protection afforded to secured lenders to recognize some value greater than their allowed secured claim – either by treating their unsecured claim as a secured deficiency claim under § 1111(b), or bidding their credit under § 363(k) in hopes of realizing a potential upside in the collateral. Asserting an absolute right to such preferential treatment is plainly contrary to other provisions of the Code, which limit a secured lender's recovery to the value of its secured interest even when it is not permitted to make a § 1111(b) election.[15] For instance, if a debtor proceeds with a sale of encumbered assets under subsection (i), there is no § 1111(b) election because the assets are "sold under the plan." 11 U.S.C. § 1111(b)(1)(a)(ii). However, § 1129(b)(2)(A)(i)(I) still caps the transferred lien at the value of the lender's allowed secured claim, as established by judicial

_____

[15]It is perhaps this point upon which our opinion and the dissent most fundamentally diverge. The dissent notes a variety of rights enjoyed by secured creditors under "longstanding nonbankruptcy law" – most notably the right to foreclose in the event of default – and then argues that "Congress extended this protection within bankruptcy." *Dissent op.* Part III.B. While we agree that Congress set out certain specific protections for secured lenders, we view these protections as more evenly balanced with the overarching purpose of the Chapter 11 – to preserve the Debtor as a viable economic entity post-reorganization. Tellingly in this regard, among the immediate effects of the filing of a bankruptcy petition is a stay of all creditors' rights to foreclose on property of the debtor. *See* 11 U.S.C. § 362(a).

valuation under § 506(a).  The deferred cash payments under § 1129(b)(2)(A)(i)(II), are also limited to the present value of the deferred payments.  Thus when a debtor proceeds under subsection (i), a lender who is ineligible to make a § 1111(b) election is still limited in its recovery to the judicial valuation of its secured interest in the collateral.

As the court noted in *Pacific Lumber*, a secured lender's expectation of benefitting from the eventual appreciation of collateral (the so-called "upside" of the collateral) is not an entitlement when the property is part of a bankruptcy estate:

> The Bankruptcy Code . . . does not protect a secured creditor's upside potential; it protects the "allowed secured claim."  If a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full simply to protect the "upside potential."

*Pacific Lumber*, 584 F.3d at 247.  Rather, the Code provides for a variety of treatments of secured claims, all of which are calculated to balance the interests of the secured lender and the protection of the reorganized entity, and none of which ensure an advantageous return on a secured investment.  These powers are necessary to allow the debtor to "emerge from bankruptcy with property cleansed of all hidden liens, ensuring that future businesses will transact with the reorganized entity without fear that an unanticipated creditor will emerge with a superior interest in purchased property."  *In re Airadigm Comms., Inc.*, 519 F.3d 640, 649 (7th Cir. 2008).

Because our plain reading of § 1129(b)(2)(A) is not at odds with the operation of §§ 1111(b) and 363(k), we may only consider the legislative history advanced by the Lenders if it evidences an "extraordinary showing of contrary intentions" by Congress. *Albertini*, 472 U.S. at 680; *see also Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 406 (3d Cir. 2004) ("The Supreme Court has repeatedly explained that recourse to legislative history or underlying legislative intent is unnecessary when a statute's text is clear and does not lead to an absurd result." (internal citation omitted)). There is no such "extraordinary showing" here.

The specific history on which the Lenders rely is a congressional statement made in connection with the enactment of § 1111(b). In that statement, Representative Edwards noted:

> Sale of property under section 363 or under a plan is excluded from treatment under section 1111(b) because of the secured party's right to credit bid in the full amount of its allowed claim at any sale of collateral under section 363(k) of the House Amendment.

124 Cong. Rec. 31795, 32407 (Sept. 28, 1978); 124 Cong. Rec. 33130, 34007 (identical remarks of Senator DeConcini). The Lenders contend that this statement reflects Congressional intent to ensure that secured lenders who could not make a § 1111(b) election had the ability to credit bid under § 363(k).

The present dispute aside, this statement ignores at least two uncontroverted circumstances, explained above, where a

42

secured creditor has neither a right to make a § 1111(b) election, nor a right to credit bid under § 363(k): a transfer of encumbered assets under § 1129(b)(2)(A)(i)(I) and a for-cause exception to credit bidding under § 363(k). Given that this legislative history ignores these vital functions of the Code, we cannot credit it over the plain language of the statute to confer an absolute right to credit bid on all asset sales under § 1129(b)(2)(A).

Ultimately, we are left where we began – where the statutory directive is clear we are bound to enforce that directive. To the extent this holding permits a course of conduct not contemplated or not desirable under the Code, as the Lenders argue it does, it is the sole province of Congress to amend a statute that carries out by its plain language an undesirable end. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding.").

Finally, our holding here only precludes a lender from asserting that it has an absolute right to credit bid when its collateral is being sold pursuant to a plan of reorganization. Both the District Court below and the Fifth Circuit in *Pacific Lumber* contemplated that, in some instances, credit bidding may be required. *See* 584 F.3d at 247. In addition, a lender can still object to plan confirmation on a variety of bases, including

43

that the absence of a credit bid did not provide it with the "indubitable equivalent" of its collateral.[16]

## IV.

Accordingly, we agree with the District Court and the Fifth Circuit that § 1129(b)(2)(A) is unambiguous and that a plain reading of its provisions permits the Debtors to proceed under subsection (iii) without allowing the Lenders to credit bid. Because we are directed to cease our inquiry when we are satisfied that the applicable statutory language is unambiguous, we will affirm the District Court on those grounds.

---

[16]For instance, the Lenders argue here that the Bankruptcy Court made a factual finding that the exclusion of credit bidding was not a legitimate exercise of the Debtors' business judgment. Because the question before us is a purely legal one, and because we find no basis in the record for concluding that the Bankruptcy Court's observation was a finding of fact, we decline to address that argument here.

*In re Philadelphia Newspapers, LLC*
No. 09-4266

SMITH, *Circuit Judge*, concurring.

Judge Fisher has written well, and convincingly, and I join his opinion without reservation—save for section III(C). I write separately because recourse to legislative history, as occurs in section III(C), is unnecessary as the statutory language of § 1129(b)(2)(A) is unambiguous. "[R]ecourse to legislative history or underlying legislative intent is unnecessary when a statute's text is clear and does not lead to an absurd result." *Hay Group, Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 406 (3d Cir. 2004) (internal quotation marks omitted); *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004); *AT&T Inc. v. Fed. Commc'ns Comm'n*, 582 F.3d 490, 496-98 (3d Cir. 2009); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (en banc); *United States ex rel. Mistick PBT v. Housing Auth. of the City of Pittsburgh*, 186 F.3d 376, 395 (3d Cir. 1999); *see United States v. Terlingo*, 327 F.3d 216, 221 n.1 (3d Cir. 2003) (Becker, J.) ("[W]e may only look to legislative history if [the] plain meaning produces a result that is not just unwise but is clearly absurd.") (internal quotation marks omitted); *see also Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003) (Ambro, J.) ("We do not look past the plain meaning unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it[.]") (internal quotation marks and citations omitted). This approach to statutory interpretation

1

"respects the words of Congress" and "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie*, 540 U.S. at 536.

I sympathize with the dissent's desire to honor what it believes was Congress's intent in codifying § 1129(b)(2)(A).[1] But the near-gymnastics required to reach its conclusion reveal the tenuous nature of this approach. As sensible as the dissent's approach to credit bidding may be, I simply cannot look past the statutory text, which plainly supports the conclusion that § 1129(b)(2)(A) does not require credit

---

[1] That being said, I fear that the dissent's interest in the policy underlying § 1129(b)(2)(A), as evidenced by its reliance on an unpublished manuscript, Dissenting Op. Section I(A), and a trade publication article, *id.* at Section II(B), both of which prescribe a disposition for the very appeal we are tasked with deciding, has led it astray. There may be sound policy reasons for the dissent's approach, but such reasons cannot overcome the plain meaning of § 1129(b)(2)(A). *See DiGiacomo v. Teamsters Pension Trust Fund of Philadelphia and Vicinity*, 420 F.3d 220, 228 (3d Cir. 2005). "We do not sit here as a policy-making or legislative body." *Id.*; *Cybergenics Corp.*, 330 F.3d at 587 (Fuentes, J., dissenting) (joined by Sloviter, Alito, Smith, JJ.) ("[T]he Supreme Court has rejected the notion that the federal courts have any policy-making role in construing clear statutory language."); *see Lamie*, 540 U.S. at 538 ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding.").

2

bidding in plan sales of collateral free of liens. Section 1129(b)(2)(A) uses the word "or" to separate its subsections. "'[O]r' is not exclusive[.]" 11 U.S.C. § 102(5). Thus, satisfaction of *any* of the three subsections is sufficient to meet the fair and equitable test of § 1129(b)(2)(A). "Congress, of course, remains free to change [our] conclusion [regarding § 1129(b)(2)(A)] through statutory amendment." *Small v. United States*, 544 U.S. 385, 394 (2005); *Lamie*, 540 U.S. at 542 ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent."). For now, we are required to apply the statute as written, and I am satisfied that its plain text amply supports the result reached by the majority.

In Re: Philadelphia Newspapers, LLC, et al.
Nos. 09-4266 & 09-4349

---

AMBRO, Circuit Judge, dissenting

Although few in the first 30 years of Bankruptcy Code jurisprudence read it that way, the majority today holds that 11 U.S.C. § 1129(b)(2)(A)(ii) is not the exclusive method through which a debtor can cram down a plan calling for the sale of collateral free of liens. I am convinced this is not what Congress intended when it drafted the Bankruptcy Code.

Though I do not impugn as implausible my colleagues' reasoning otherwise, I cannot agree that the plain language of § 1129(b)(2)(A) is unambiguous and compels the sole interpretive conclusion they see as the plain meaning of the words. There is more than one reasonable reading of the statute, and thus we cannot simply look to its text alone in determining what Congress meant in enacting it. When we apply long-established canons of statutory interpretation to § 1129(b)(2)(A), examine it in the context of the entire Bankruptcy Code, and look at the section's legislative history and the comments of Code drafters, they all point to the conclusion that the Code requires cramdown plan sales free of liens to fall under the specific requirements of § 1129(b)(2)(A)(ii) and not to the general requirement of subsection (iii). Thus I would reverse the judgment of the District Court and restore the presumptive right to "credit bid" provided in subsection (ii).

## I.    Background Matters

### A.    Factual Background

The debtors seek to sell their assets free of liens and to stop their secured lenders from bidding at sale up to the full credit they have extended.  To understand why, we need to know the backstory.  While the majority summarizes many of the relevant facts, I highlight a few that were omitted with respect to the apparent motivations behind the attempt to deny credit bidding here.

As part of a high-stakes game of chicken, the debtors have engaged in an extensive advertising campaign related to the proposed auction that promotes the message "Keep it Local."  This is apparently a reference that the Stalking Horse Bidder—largely composed of and controlled by the debtors' current and former management and equityholders—is the favored suitor.[1]  Perhaps the most striking example of the type

---

[1] Judge Raslavich of the Bankruptcy Court picked up on this in noting of the "Keep it Local" campaign that

> there's a lot of personal pronouns in those ads that refer[] to "our plan" and "our retention of ownership," and arguably a reasonable reader of that does come away with the notion that it's slanted not towards even another local bidder[,] but to the [Stalking Horse Bidder].  That's the

2

of game the debtors are playing is the two-years of *free rent* on the building to be leased to the Stalking Horse Bidder, while ostensibly "surrendering" the building to the secured lenders.

This did not go unnoticed by the Bankruptcy Court. It observed that, on the facts of the case, credit bidding appeared necessary to ensure fairness in light of the insider nature of the Stalking Horse Bidder, the extensive "Keep it Local" campaign, and its perception that the debtors' strategies were designed "not to produce the highest and best offer. . . ."[2] *In re Philadelphia Newspapers, LLC*, No. 09-11204, slip op. at 21 (Bankr. E.D. Pa.

---

> fairest impression of those ads that it is endorsing the retention of the newspaper by the stalking horse bidder.

App. 1500a–01a (Hr'g Tr. 17:22–18:4, Sept. 9, 2009).

[2] *See also* Vincent S.J. Buccola & Ashley C. Keller, *Credit Bidding and the Design of Bankruptcy Auctions* at 18 (u n p u b l i s h e d m a n u s c r i p t ), *a v a i l a b l e a t* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1545423 (last accessed Mar. 5, 2010) ("Because corporations and the people who manage them often have misaligned interests, it is hardly implausible that a debtor's officers would seek to sell the bankrupt's business to a low-value bidder in exchange for some personal remuneration that does not redound to the benefit of the enterprise as a whole. . . . [K]eeping willing buyers from casting bids is the most effective means for management to steer the debtor's assets to a favored, low-value purchaser.").

3

Oct. 8, 2009). Indeed, the Bankruptcy Court noted that there was "little that points to a different conclusion." *Id.* The Court gave the debtors "the benefit of the doubt as to their motives," yet still could "discern no plausible business justification for the restriction [on credit bidding] which Debtors [sought] to include in the Bid Procedures." *Id.* at 22.

The Stalking Horse Bidder is seeking to pay as little as possible to obtain the assets "on the cheap" in a Circuit where secured lenders are allowed to bid up to the full amount of their debt owed despite Bankruptcy Code § 506(a) (which when applicable "split[s] . . . partially secured claims into their secured claim and unsecured claim components"). *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006). What typically occurs is that, if there are no other bidders, the secured lenders get the assets rather than the Stalking Horse Bidder (unless, of course, the Stalking Horse Bidder increases its bid to a number that is the secured lenders' "reservation price," *i.e.*, the price they are willing to have the Stalking Horse pay cash that will essentially be transferred to them). If credit bidding is denied, however, the debtors' insiders stand to benefit by having more leverage to steer the sale to a favored purchaser (here, the Stalking Horse Bidder). This is explained below.

## B. Credit Bidding

Though the majority does not discuss it at length, an understanding of credit bidding is helpful. A credit bid allows

a secured lender to bid the debt owed it in lieu of other currency at a sale of its collateral. In *SubMicron*, we discussed the rationale behind credit bidding in the context of a sale of debtors' property outside the ordinary course of business under § 363 of the Bankruptcy Code. 432 F.3d at 459–61. We held that a secured creditor can "credit bid" the entire face value of its secured claim, including the unsecured deficiency portion. The reason behind this was that a credit bid "by definition . . . *becomes* the value of [the] [l]ender's security interest in [the collateral]." *Id.* at 460 (emphasis in original).

The practical rationale for credit bidding is that a secured lender would "not outbid [a] [b]idder unless [the] [l]ender believe[d] it could generate a greater return on [the collateral] than the return for [the] [l]ender represented by [the] [b]idder's offer." *Id.* Conversely, if a bidder believed that a secured lender was attempting to swoop in and take the collateral below market value and keep the upside for itself, that bidder presumably would make a bid exceeding the credit bid. In this manner, credit bidding is a method of ensuring to a secured lender proper valuation of its collateral at sale.[3]

---

[3] Like the majority's reading of *SubMicron*, my reading of that opinion (which I authored) also "does not equate to a holding that a credit bid must be the successful bid at a public auction." Maj. Op. at 30. *SubMicron*'s logic presumes that the credit bidder will not be the buyer if another bidder values the assets more highly. It is curious why the majority even brings up this point, for no doubt the credit bid need not be the winning

Although some may argue that credit bidding chills cash bidding, that argument underwhelms; credit bidding chills cash bidding no more than a deep-pocketed cash bidder would chill less-well-capitalized cash bidders.[4] Having the ability to pay a certain price does not necessarily mean there is a willingness to pay that price.

## C.    Cramdown

An understanding of cramdown is also helpful. Section 1129 of the Bankruptcy Code addresses the confirmation of Chapter 11 plans, including plans that involve the sale of property of the estate. Subsection 1129(a) provides the

---

bid; rather, the presumptive right to credit bid must be afforded the secured creditor.

[4] *See also* Buccola & Keller, *supra*, at 20–21 ("For instance, if a would-be bidder knows that Warren Buffett plans to attend an auction, she is also surely aware that Buffett can top her reservation price for any or all of the assets on the block. Yet nobody proposes to ban wealthy *cash* bidders from participating in a bankruptcy auction. . . . Would-be bidders understand that a deep-pocketed player's *ability* to top their reservation price does not imply a *willingness* to do so. Warren Buffett did not become wealthy by overpaying for things, so it is possible, indeed, probable, that his reservation price for an asset at auction will be beneath that of another buyer. And buyers know this in advance. The same logic holds for secured creditors.") (emphasis in original).

requirements that a plan must meet in order to gain confirmation from the Bankruptcy Court. 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the following requirements are met . . . ."). Included is the requirement in § 1129(a)(8) that each class of claims or interests either accept the plan or not be impaired under it. *Id.* § 1129(a)(8). However, the debtor can "cram down" the plan over the objections of an impaired class by satisfying the requirements of § 1129(b).

The principal touchstone of cramdown under § 1129 is that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id.* § 1129(b)(1). The requirements for what is "fair and equitable" for secured claims are stated in subsection (b)(2)(A):

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements . . . (A) With respect to a class of secured claims, the plan provides—
>
> > (i)
> >
> > > (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed

7

amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k)[5] of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to

---

[5] Section 363(k) of the Bankruptcy Code provides the right to credit bid, and it reads as follows:

(k) At a sale under subsection (b) of this section [a sale other than in the ordinary course of business] of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

> attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

*Id.* § 1129(b)(2)(A).  At issue for us is whether, when a plan provides for a sale of secured property free of liens, subsection (ii) is the sole point of reference for what is required to cram down a plan on the secured creditor.

## II.  Section 1129(b)(2)(A) Has More Than One Plausible Interpretation.

Though the majority attempts to use literal text in isolation to support its conclusion, that reading cannot be the only plausible reading of § 1129(b)(2)(A).  Indeed, both the District Court and the Bankruptcy Court read the statute in a plausible fashion, yet came to opposite conclusions. Reasonable minds can differ on the interpretation of § 1129(b)(2)(A) as it applies to plan sales free of liens.  This indicates that the provision is ambiguous when read in isolation and does not have a single plain meaning.[6]

---

[6] In no way am I suggesting that disagreement between the District Court and the Bankruptcy Court is dispositive of ambiguity.  Nor do I suggest that, when disagreement among courts exists, we "would never be permitted to reverse [a

## A. The more-recent interpretation of § 1129(b)(2)(A) adopted by the majority

To recap my colleagues' reasoning, § 1129(b)(2)(A)(iii) can be used to cram down a plan sale free of liens, without credit bidding, over the objections of creditors because they read the plain text as unambiguous. In support of their position, they cite to a recent decision by the Fifth Circuit Court of Appeals, authored by its Chief Judge, a highly respected former bankruptcy lawyer. *See Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009) (Jones, C.J.).[7] That case reasons that

_____

District Court] on plain language grounds." Maj Op. at 33–34. I merely point out that each reasonable interpretation has been adopted during the course of this litigation. The ambiguity is tied to the susceptibility of the statutory text to two reasonable interpretations and not that two courts have seen the issue differently.

[7] This is the only appellate decision to my knowledge holding that plan sales free of liens may be accomplished through clause (iii). My colleagues and the debtors also refer to a Bankruptcy Court decision of recent vintage, *In re CRIIMI MAE, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000), but the plan in that case is easily distinguishable. Although it involved a plan sale of collateral free of liens and without credit bidding, there was also substitute collateral provided to help make up for any shortfall from the proceeds of sale. Indeed, the *CRIIMI MAE* Court made note of the distinction between a plan without substitute

10

because "or" is disjunctive, the three clauses of § 1129(b)(2)(A) are "alternatives" that "are not even exhaustive." *Id.* at 245. (The latter is because the word "includes" in § 1129(b)(2) "is not limiting." *Id.* (*citing* 11 U.S.C. § 102(3)).) It thereby concluded that the clauses were not compartmentalized alternatives. *Id.* at 245–46. As a result, clause (iii) could be analyzed in isolation and could provide a means of confirmation without regard to clauses (i) and (ii). *Id.* at 246–47.

The Court next determined that clause (iii) did not render clause (ii) superfluous facially or as applied to the plan before it. Although it recognized that "a credit bid option might render Clause (ii) imperative in some cases," *id.* at 246, it determined that a payment of sale proceeds to the secured lenders was an "indubitable equivalent" because "paying off secured creditors in cash can hardly be improper if the plan accurately reflected the value of the . . . collateral," *id.* at 247. Thus, the Court rejected the secured lenders' right to credit bid because the plan accomplished its sale through clause (iii) (which does not mention credit bidding), not clause (ii) (which does).

With *Pacific Lumber* as authority, my colleagues reason that § 1129(b)(2)(A) provides three distinct alternatives for a

---

collateral under clauses (i) or (ii), and a plan with substitute collateral under clause (iii). 251 B.R. at 807.

plan sale.[8]  Finding Congress's use of "or" in § 1129(b)(2)(A)

_____

[8] The majority also relies heavily on a case interpreting ERISA § 502(a), *Varity Corporation v. Howe*, 516 U.S. 489 (1996), to support its textual analysis of the Bankruptcy Code. *Varity* held that ERISA § 502(a)(3) (allowing actions to remedy violations of the terms of the benefit plan or subchapter I of ERISA) could be used to redress some breaches of fiduciary duty to plan participants because, even though § 502(a)(2) already addressed fiduciary duties, it merely "reflect[ed] a special congressional concern about plan asset management." 516 U.S. at 511.  That holding does not apply to our case, and in any event does not lead inexorably to the majority's conclusion.

Unlike the majority, I see no way to read clause (ii) of Bankruptcy Code § 1129(b)(2)(A) as a "special congressional concern" without also concluding that Congress intended clause (ii) to be exclusively applicable to plan sales free of liens. Clause (ii) is a broad statement that any time a plan proposes a sale free of liens, regardless of the precise method (judicial sale, auction, *etc.*), it must conform to the prescriptions of that provision.  While the majority is correct that "Congress' inclusion of the indubitable equivalence prong intentionally left open the potential for yet other methods of conducting asset sales," Maj. Op. at 22, the Bankruptcy Code does not make clear that a debtor has options "other than, and in addition to," 516 U.S. at 511, clause (ii) for a plan sale *free of liens*.  Certainly a debtor has the option to use other methods of plan sales (such as a sale subject to lien or with a replacement lien), but a plan sale free of liens goes to the heart of clause (ii).  As discussed below, it is illogical to think that Congress had a "special concern" only with respect to plan sales free of liens and subject

12

"not without purpose," the majority reads the statute to

_____

to credit bidding, and not *all* plan sales free of liens. The majority is missing a step in the logical progression when it glosses over this fact without offering a compelling reason why the provision should be read in a manner that effectively reads out clause (ii).

Although the majority ostensibly uses *Varity* to hew to the plain text, I believe the reason why the dissenting view in *Varity* was rejected is instructive. Justice Thomas found that the *Varity* majority's holding "cannot be squared with the text or structure of ERISA." 516 U.S. at 516 (Thomas, J., dissenting). Applying the same two canons of statutory interpretation I apply below (the specific governs the general and anti-superfluousness), Justice Thomas reached the textual conclusion that the specific provision of § 502(a)(2) provided the "exclusive mechanism for bringing claims of breach of fiduciary duty." *Id.* at 520, 521.

The *Varity* Court reached its unique interpretive result over Justice Thomas's dissent because of particular idiosyncracies in the text of ERISA § 502(a), none of which exists here (such as the narrow construction of § 502(a)(2) by the Supreme Court in *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 142 (1985)). Clause (ii) of § 1129(b)(2)(A) embodies a congressional concern about *all* plan sales free of liens, and clause (iii) is the general provision enacted by Congress for plan sales not otherwise accounted for. Unlike ERISA § 502(a)(2), there is no "remainder" in the universe of plan sales free of liens. As such, there is no need to take the extra step the *Varity* Court did and provide a statutory hook through clause (iii).

13

"elevate[] fair return to the lenders over the methodology the debtor selects to achieve that return." Maj. Op. at 26. Even though clause (ii) specifically refers to a sale free of liens and incorporates a general credit bid right, the majority permits plans proposing a free and clear asset sale to fall under clause (iii) because a contrary outcome would be "at odds with the fundamental function of the asset sale, to permit debtors to 'provide adequate means for the plan's implementation.'" *Id.* at 11 (*citing* 11 U.S.C. § 1123(a)(5)(D)).

## B. The longer-lived interpretation of § 1129(b)(2)(A)

The majority presents one reading. Another (the one I subscribe to and, as noted below, the longer-lived reading) exists. It restricts plan sales free of liens to clause (ii).

While the Code states that "'or' is not exclusive" in § 102(5) (and that is true as a general proposition), it is not always the case in practice. Numerous sections of the Bankruptcy Code employ the disjunctive "or" in a context where the alternative options render the "or" exclusive. *See, e.g.*, 11 U.S.C. § 365(g)(2)(B)(i)–(ii) (assumption of executory contrary before or after conversion), 506(d)(1)–(2) (voiding liens for disallowed claims for one of two reasons), 1112(b)(1) (conversion or dismissal of a Chapter 11 case), 1325(a)(5)(B)–(C) (requirements for confirmation of a Chapter 13 plan), 1325(b)(3)(A)–(C) (means test categories), 1325(b)(4)(A)(i)–(ii) (same); *see also Williams v. Tower Loan*

14

*of Miss., Inc. (In re Williams)*, 168 F.3d 845, 847–48 (5th Cir. 1999) (holding that § 1325(a)(5)(B) & (C) required an exclusive-or construction to avoid creating an option that Congress did not intend to create); 2 *Collier on Bankruptcy* ¶ 102.06 & n.1, at 102-13 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (noting that a non-exclusive reading is permissible only "if context and practicality allow" and citing to § 1112(b) as an example where "[i]t would be impossible for the court to do both."). Nor is an exclusive-or in our particular context inconsistent with the cases cited by the majority, Maj. Op. at 16–17, for those cases hold only that the word is the disjunctive "or," not the conjunctive "and." The lesson is that we "do not read [the Bankruptcy Code] with the ease of a computer." *Kelly v. Robinson*, 479 U.S. 36, 49 (1986) (*citing Bank of Marin v. England*, 385 U.S. 99, 103 (1966) (interpreting its predecessor, the Bankruptcy Act)).

Turning to the statutory text, the operative verb in § 1129(b)(2)(A) is not "includes," as the *Pacific Lumber* panel believed, but "provides" (that is, "[w]ith respect to a class of secured claims, the plan provides . . ."). *Cf. In re Pacific Lumber Co.*, 584 F.3d at 245–46. The majority relies on this section of *Pacific Lumber* to support its view of clauses (i)–(iii) as non-exhaustive alternatives when applied to plan sales free of liens. Maj. Op. at 24–25. *Pacific Lumber* looked to the verb "includes," but that verb attaches to § 1129(b)(2), not (b)(2)(A). "Includes" is the verb that applies in (b)(2) because it covers not only secured claims in subsection (A), but also unsecured claims in subsection (B) and classes of interests in subsection (C). In

15

contrast, once we delve into (b)(2)(A), we are solely concerned with the treatment of a class of secured claims, and the relevant verb is "provides," whereby Congress prescribes specific treatments for specific scenarios of secured-claim treatment. By way of example, this is similar to "provided," the verb used in § 1325(a)(5) and construed to require an exclusive-or construction in *In re Williams*, 168 F.3d at 846–47.

The language employed by Congress in clauses (i), (ii), and (iii) of subsection (A) thus is susceptible to another plausible reading: Congress did not list the three alternatives as routes to cramdown confirmation that were universally applicable to any plan, but instead as distinct routes that apply specific requirements[9] depending on how a given plan proposes to treat the claims of secured creditors. In contrast, the majority, in effect, "assume[s] that the plan proponent can simply choose which of these three disjunctive specifications of the requirement it wishes to satisfy." Ralph Brubaker, *Cramdown of an Undersecured Creditor Through Sale of the Creditor's Collateral: Herein of Indubitable Equivalence, the § 1111(b)(2) Election, Sub Rosa Sales, Credit Bidding, and Disposition of Sale Proceeds*, 29 No. 12 Bankruptcy Law Letter 1, 7–8 (Dec. 2009). But

---

[9] I note that § 1129(b)(2) states "the condition that a plan be fair and equitable with respect to a class includes the following *requirements . . . .*" 11 U.S.C. § 1129(b)(2). These are not mere examples, but specific requirements to be applied to distinct scenarios.

[a] perfectly (and perhaps even more) plausible alternative reading of the disjunctive specification of three means of satisfying the requirement . . . is that the plan's proposed treatment of the secured claim determines which of the three alternative specifications of the requirement must be satisfied . . . .

*Id.* at 8. While "or" may be non-exclusive in the ordinary course, the latter interpretation supports a reading of exclusivity as applied to plan sales, with the applicable clause tied to what a particular plan proposes.

That reading plays out as follows. Clause (i) applies to a situation where the secured creditor retains the lien securing its claim in a given class.[10] 11 U.S.C. § 1129(b)(2)(A)(i).

Clause (ii) applies to a situation where the plan "provides . . . for the sale . . . of any property that is subject to the liens securing such claims, free and clear of such liens."[11] *Id.*

_____

[10] By the very terms of clause (i), it applies "whether the property subject to liens is retained by the debtor or transferred to another entity." 11 U.S.C. § 1129(b)(2)(A)(i)(I). This includes sales of property where the secured creditor retains the lien securing its claim because "transferred" encompasses sales.

[11] I wonder if my colleagues' conclusion is driven in part by a misreading of clause (ii). They consider it as an "example"

17

§ 1129(b)(2)(A)(ii). It requires that the sale be "subject to section 363(k) of [the Bankruptcy Code]," the provision that gives a secured creditor the presumptive right to credit bid at the sale. *Id.* (I say "presumptive" because the "court [can] for cause order[] otherwise." *Id.* § 363(k).) Furthermore, the provision requires that the  stripped liens move from the sold property and "attach to the proceeds of such sale." *Id.* § 1129(b)(2)(A)(ii). Finally, it directs that the liens transferred to the proceeds be given "treatment . . . under either clause (i) or clause (iii) of [§ 1129(b)(2)(A)]."[12] *Id.*

---

provided by Congress and characterize it as "a free and clear sale of assets subject to credit bidding." Maj. Op. at 26. The words "free and clear of such liens" in the clause modify the noun "sale" and lead me to believe that clause (ii) is not merely an example, but an entire category of sales that is prescribed a specific treatment. Treating "sale . . . free and clear of such liens" as an example as opposed to a prescription may explain why my colleagues decline to apply the canons of statutory interpretation I apply below. *See* 11 U.S.C. § 1129(b)(2)(A)(ii) ("for the *sale*, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, *free and clear of such liens*") (emphases added).

[12] This provision also helps to understand in context the hypothetical posed by the debtors' counsel at oral argument. *See* Oral Arg. Tr. at 39:23–40:22, 49:24–50:10. In this hypothetical, a debtor has only two assets: a truck worth $100, and a truck worth $500. The $500 truck is unencumbered, while the $100 truck is encumbered by a $200 lien. Counsel argued

18

Clause (iii) applies whenever the plan "provides . . . for the realization . . . of the indubitable equivalent" of a secured creditor's claim. *Id.* § 1129(b)(2)(A)(iii). Examples of these situations include abandonment of property and providing substitute collateral (also known as a replacement lien).[13] *See* 7

that the only way to confirm a plan that sells the $100 truck free and clear of liens, and instead gives the secured creditor a $100 lien on the $500 truck, is to proceed directly through clause (iii) to confirm the plan sale.

This is incorrect. The correct analysis is that the $100 truck is sold under clause (ii), and the $100 lien attaches to the proceeds. The lien on the *proceeds* is then treated under clause (iii), and substitute collateral is provided in the form of a $100 lien on the $500 truck. Thus, clause (ii) ably handles this hypothetical, and further obviates plan sales through clause (iii).

Alternatively, if the debtor wanted to avoid credit bidding in that scenario, it could change the order of operations. The debtor would *first* give the secured creditor for the $100 truck the indubitable equivalent under clause (iii) by providing a replacement lien in the unencumbered $500 truck. It would *then* sell the now-unencumbered $100 truck, and because there is no longer a lien on that truck securing a claim, the debtor need not worry about the credit bid provision of § 1129(b)(2)(A)(ii).

[13] Even a more complicated scheme such as the *CoreStates* plan discussed by the debtors' counsel at oral argument, Oral Arg. Tr. 34:14–35:5, fits under this paradigm because it can be classified as a plan providing for a replacement lien or some combination of the clauses on a collateral-by-collateral basis. *CoreStates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R.

*Collier* ¶ 1129.04[2][c] & nn. 38, 52 at 1129-127, -129. "Indubitable equivalent" is not defined in the Code, but there can be no doubt that the secured creditor receives consideration equal to its claim in value or amount. *See Webster's Third New Int'l Dictionary* 1154 (1971) (indubitable means "not open to question or doubt" or "too evident to be doubted"); *id.* at 769 (equivalent means one that is "equal in force or amount" or "equal in value"). Although the language of clause (iii) is broad, as discussed below it is a "catch-all" not designed to supplant clauses (i) and (ii) where they plainly apply.

The reading of § 1129(b)(2)(A) just noted prescribes a specific treatment that a plan must afford to secured creditors if it allows them to retain the liens securing property. This is clause (i). Likewise, this reading of the statute prescribes a specific treatment if a plan sells property free and clear of a secured creditor's lien. This is clause (ii). And clause (iii) prescribes a specific treatment for situations not addressed by either clause (i) or clause (ii).

Proponents of this view believe Congress has prescribed the full range of possible treatments of secured claims under a plan in a compartmentalized fashion. *See, e.g.*, *In re SunCruz*

33, 49–51 (E.D. Pa. 1996) (leaving open the possibility of confirmation under clause (iii) even though clause (i) requirements were not met in a plan that did not call for the sale of collateral, but instead provided for a combination of reduced collateral and partial immediate payment).

20

*Casinos, LLC*, 298 B.R. 833, 838 (Bankr. S.D. Fla. 2003); *In re Kent Terminal Corp.*, 166 B.R. 555, 566–67 (Bankr. S.D.N.Y. 1994). Moreover, this interpretation is supported by academic discourse. *See, e.g.*, Brubaker, *supra*, at 8 ("The obvious disjunctive specification of alternative requirements, therefore, does not unambiguously permit the plan proponent to simply choose the requirement that it wishes to satisfy and bypass a requirement that specifically addresses, on its face, the treatment that the plan proposes.").

### III. Principles of Statutory Interpretation Decide Which of Two Reasonable Readings Is the More Plausible.

My colleagues' reading of § 1129(b)(2)(A) is not a trip to the twilight zone. Neither is mine. We must choose between two plausible readings of § 1129(b)(2)(A): one that allows sales of collateral free of liens under clause (iii) without credit bidding, and another that only allows such sales under clause (ii) with credit bidding generally available. With these competing maps, we need a compass pointing to the right interpretive result. In this context, I review the protocols for how courts interpret statutes. This includes applying canons of statutory interpretation, examining the context of related statutory provisions, and, when appropriate, looking to legislative history and comments of Code drafters to help understand a statute's literal words.

To know as best we can what a law means is to know as best we can what those who wrote it meant when they did so.

21

Meaning equals intent, and intent paves the path for our interpretation.

Our search for knowledge of intent begins with the law's language. *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (*citing United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). "[W]e begin with the understanding that Congress says in a statute what it means and means in a statute what it says there." *Official Comm. of Unsecured Creditors of Cybergenics Corp ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (en banc) (*citing Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000)). "When 'the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Id.* (*citing Hartford Underwriters*, 530 U.S. at 6); *see also Ron Pair*, 489 U.S. at 241. "We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004).

Yet words that may seem plain often are not. *See United Parcel Serv., Inc. v. U.S. Postal Serv.*, 455 F. Supp. 857, 865 (E.D. Pa. 1978) (Becker, J.) ("Although it is received wisdom that when a statute's plain meaning is clear 'the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion,' it is also an endorsed caveat to this rule that '[w]hether . . . the words of a statute are

clear is itself not always clear.'") (citations omitted); *see also Tex. State Comm'n for the Blind v. United States*, 796 F.2d 400, 406 (Fed. Cir. 1986) (en banc) (same).

Canons of statutory interpretation counsel courts to read the statutory scheme in a manner that gives effect to every provision Congress enacted and avoids general provisions swallowing specific provisions, especially when to do so makes the specific superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932). In addition, any search for the meaning of words needs context for understanding intent, particularly when dealing with the Bankruptcy Code. *Cybergenics*, 330 F.3d at 559 ("[S]tatutory construction is a holistic endeavor . . . ." (*citing United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))). A court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law and to its object and policy." *Id.* (*citing Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). Indeed, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Timbers*, 484 U.S. at 371. If ambiguity in statutory text remains, a court may inquire beyond the plain language into the legislative history. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984).

Congress worked on drafting the Bankruptcy Code for nearly a decade, and it "intended 'significant changes from

[prior] law in . . . the treatment of secured creditors and secured claims.'" *Ron Pair*, 489 U.S. at 240 (citations omitted). "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of a statute." *Id.* at 240–41. This plain meaning "should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Id.* at 242 (citation omitted). A result may be demonstrably at odds with the intentions of the Code's drafters if it "conflict[s] with any other section of the Code, or with any important state or federal interest . . . [or] a contrary view suggested by the legislative history." *Id.* at 243.

With this in mind, applying well-established principles of statutory interpretation leads me to conclude that § 1129(b)(2)(A)(ii) is the sole provision applicable to plan sales free of liens.

## A. Canons of Statutory Construction

### 1. Specific provisions prevail over general provisions.

Statutory Construction 101 contains the canon that a specific provision will prevail over a general one. *See* Norman J. Singer & J.D. Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 46:5 ("Where there is inescapable conflict between general and specific terms or provisions of a

24

statute, the specific will prevail."). This canon long predates both the Bankruptcy Code and the prior Bankruptcy Act, and Congress no doubt was well aware of it when crafting the Code. "General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Popkin*, 285 U.S. at 208 (construing sections of the Bankruptcy Act of 1898) (citations omitted); *see also Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335–36 (2002) ("It is true that specific statutory language should control more general language when there is a conflict between the two . . . [, unless] there is no conflict [and] [t]he specific controls . . . only within its self-described scope."); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957) ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.") (citations omitted); *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944) (same) (*citing Popkin*, 285 U.S. at 208).

There are two specific clauses in the context of the "fair and equitable" requirements of a plan and one general clause. To repeat, clause (i) applies to all situations, including plan sales, where the lien on the sold collateral is retained. Clause (ii) applies to all plan sales that sell the collateral lien-free. It provides specific requirements to apply when a plan proposes such a sale. Clause (iii) is a general provision often regarded as

25

a residual "catch-all"[14] that applies to the balance of situations not addressed by clauses (i) and (ii).

To use clause (iii) to accomplish a sale free of liens, but without following the specific procedures prescribed by clause (ii), undoubtedly places the two clauses in conflict. It seems Pickwickian to believe that Congress would expend the ink and energy detailing procedures in clause (ii) that specifically deal with plan sales of property free of liens, only to leave general language in clause (iii) that could sidestep entirely those very procedures. Unlike the majority, I do not read the language to signal such a result; I read the text to show congressional intent to limit clause (iii) to those situations not already addressed in prior, specifically worded clauses.[15]

---

[14] In the similar context of adequate protection under § 361, we have held that the phrase "indubitable equivalent" in the third of § 361's three subclauses is "*regarded as a catch all*, allowing courts discretion in fashioning the protection provided to a secured party." *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (emphasis added).

[15] Nor is clause (ii) so specific so as to render itself inconsequential even though it includes a proviso set off by commas from the rest of the clause—"subject to section 363(k) of this title." 11 U.S.C. § 1129(b)(2)(A)(ii). The grammatical structure of a statute, including the positioning of commas, should be considered in statutory interpretation, and indeed, it can "mandate" a particular reading of a statute. *Ron Pair*, 489

Inasmuch as the majority argues that clause (ii) does not operate as a limitation on clause (iii) because they are not in conflict, Maj. Op. at 22–23 & n.8, I do not understand how that can be the case here. Clause (ii) *requires* a presumptive right to credit bid at a plan sale free of liens; as construed by the majority, clause (iii) can be used in a plan sale free of liens without a right to credit bid. When one clause makes the right presumptive, and the other makes that right nonexistent, and both are believed to govern an otherwise identical sale scenario,

---

U.S. at 241–42. Mirroring *Ron Pair*, which concerned the construction of another provision in the Bankruptcy Code (§ 506(b)), we are confronted by a "phrase . . . set aside by commas" from the balance of the sentence. *Id.* at 241.

Without the commas here, the object of the sentence is no longer a "sale," but is instead a "sale subject to section 363(k)." Such a grammatical structure would mean that clause (ii) only applies to the narrow class of sales that are subject to § 363(k). This makes no sense, inasmuch as § 363(k) on its own swims only in the lane of non-plan sales outside the ordinary course of business. It expands its coverage to plan sales by virtue of § 1129(b)(2)(A)(ii).

Thus, I believe we cannot ignore the punctuation and the "natural reading" that Congress has provided us and limit the scope of clause (ii). "[S]ubject to section 363(k)" is a non-restrictive clause specifying the requirements to be followed under clause (ii), not the scope of the clause's applicability. With this understanding, clause (ii) is applicable to all sales free and clear of liens securing claims, and all sales under clause (ii) must comply with the requirements outlined in § 363(k).

27

there is undisputably a conflict between the construction of the provisions. Indeed, the majority later contradicts itself when it states that "the scope of the 'indubitable equivalent' prong is circumscribed by the same principles that underlie subsections (i) and (ii)." *Id.* at 28. As I understand it, to circumscribe the scope is to limit that scope. *See Webster's Third New Int'l Dictionary* 410 (defining circumscribe as "to surround by or as if by a boundary . . . [or] to set limits or bounds to . . . [or] to constrict the range or activity of . . . [or] to define, mark off, or demarcate carefully").

Although it may be facile to conclude that the general language of clause (iii) is applicable to plan sales free of liens, such a result ignores the specific language Congress enacted in clause (ii).

## 2. The majority's reading violates the anti-superfluousness canon.

A "cardinal principle of statutory interpretation" is that no provision "shall be superfluous, void, or insignificant." *TRW*, 534 U.S. at 31; *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (applying the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative" (citations omitted)).

28

As noted above, § 1129(b)(2)(A) has two specific clauses and one general clause in the context of the "fair and equitable" requirements of a plan.  Clause (iii) cannot apply where clause (i) or clause (ii) apply, as otherwise those clauses become no more than measures seen only as overmuch.  The Bankruptcy Code would not need the "intricate phraseology," *Timbers*, 484 U.S. at 373, of the three clauses under § 1129(b)(2)(A), but instead would simply have said that, "[w]ith respect to a class of secured claims, the plan provides for the realization by such holders of the indubitable equivalent of such claims."  A presumptive right to credit bid would not need to be specifically mentioned if, as the majority believes, it was not a requirement of a plan sale free of liens.

Because "[i]t is our duty 'to give effect, if possible, to every clause . . . of the [s]tatute,'" I do not read clause (iii) in a fashion that renders clauses (i) and (ii) unnecessary.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citations omitted); *Gustafson*, 513 U.S. at 574.  To do so would render clause (ii) "a practical nullity."  *Timbers*, 484 U.S. at 375.  I know no reason why Congress would want to allow the more general language of clause (iii) to reach an outcome contrary to the express terms of a provision in the same subsection of § 1129(b)(2)(A)—clause (ii).  Thus, the anti-superfluous canon supports a reading that restricts to clause (ii) plan sales free of liens.

## B. Context can give clarity to statutes.

Disputed laws set in context may "clarif[y] . . . the remainder of the statutory scheme." *Timbers*, 484 U.S. at 371. As context colors content, we look beyond the individual provision and consider § 1129(b)(2)(A) as a part of a coherent whole—the Bankruptcy Code. The Code recognizes that secured lenders have bargained for a property interest in the collateral. Under longstanding nonbankruptcy law they are entitled to foreclose on the collateral by selling it and keeping the proceeds up to the amount of the debt secured by the collateral. *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594–95 (1935) (Brandeis, J.) ("[T]he [secured lender] [has] the following property rights recognized by [state law]: . . . The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.").

Congress extended this protection within bankruptcy and, in keeping with the *Butner* principle, intended to preserve the presumptive right of a secured creditor under applicable state law to take the property to satisfy the debt. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (holding that, "[u]nless some federal interest requires a different result," bankruptcy law requires "[u]niform treatment of property interests by both state and federal courts"). In circumstances where this was not possible, Congress provided other protections in the Bankruptcy

30

Code for the secured creditor. These other provisions explain the object and policy of the Bankruptcy Code when addressing the "cramdown" of a plan over a secured creditor's objection.

Other sections of the Code related to plan sales of encumbered property free of its liens, as well as sections concerning the protection afforded to secured creditors, support a reading of § 1129(b)(2)(A) that clause (ii) is the exclusive way to confirm cramdown plan sales of property free of liens. Of particular note are three related provisions in the Code—§§ 1123(a)(5)(D), 363(k), and 1111(b). Those sections, in conjunction with § 1129(b)(2)(A), are integrated parts of congressional policy pertaining to secured creditors' rights when their collateral is sold, as recognized in bankruptcy's leading treatise and in academic literature. *See* 7 *Collier* ¶¶ 1129.04[2][b][i], [ii] & n.33, at 1129-125 to -126; Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 155 (1979).[16]

### 1. Section 1123(a)(5)(D)

Bankruptcy Code § 1123 governs the contents of a Chapter 11 plan, and it allows plans to provide adequate means

---

[16] Professor Klee served as associate counsel to the Committee on the Judiciary, U.S. House of Representatives, and was one of the principal drafters of the Bankruptcy Code.

for implementation, including the "sale of all or any part of the property of the estate, either subject to or free of any lien." 11 U.S.C. § 1123(a)(5)(D). Plans can provide for sales of collateral in one of two fashions: (1) subject to lien, or (2) free of any lien. As to the liens themselves, there are two types: (a) the original lien securing a claim, or (b) a replacement lien securing a claim. Accordingly, we have three ways in which a plan can provide for the sale of collateral: (i) subject to the initial lien retained by the secured creditor, (ii) free of any lien, or (iii) after providing a replacement lien on different collateral (such that the previously liened collateral is sold unencumbered). These three possibilities correspond to clauses (i), (ii), and (iii), and help to clarify the three alternatives in § 1129(b)(2)(A).[17] Section 1123(a)(5)(D) thus appears to place all plan sales of property securing debt, which are sold clear of liens, within the purview of § 1129(b)(2)(A).

I disagree with the majority that § 1123(a)(5)(D), in permitting debtors to "provide adequate means for the plan's implementation," allows them to craft a means (a cramdown plan sale free of liens without credit bidding) that is contrary to the express text of the Bankruptcy Code. The majority argues that to "read the statute in [a limiting] manner significantly

---

[17] Clause (iii) also applies to abandonment of property, but that application is not implicated when the collateral is sold. *See In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989). Likewise, clause (i)'s applicability to non-sale transfers is not implicated when the collateral is sold.

curtails the ways in which a debtor can fund its reorganization" and thereby is at odds with § 1123(a)(5)(D). Maj. Op. at 24. Taken to its logical conclusion, this argument would allow debtors to disregard the statutory requirements of the plan approval process so long as the motivation was to ensure "adequate means" to implement a plan. This is a road too far. In contrast, the reading of § 1123(a)(5)(D) I propose with respect to plan sales is consistent with the text and the principles of the Bankruptcy Code.

## 2.    Section 363(k)

Section § 363 (and thus § 363(k)) applies to sales of property outside the ordinary course of business, but § 363(k) has been imported into § 1129(b)(2)(A)(ii). Notably, § 363 does not specify a particular method of sale, but it does specify in subsection (k) that a secured creditor has the right to credit bid its debt, subject to the power of the court for cause to order otherwise. Congress deems the ability of secured creditors to credit bid so important that it applies as well to sales of collateral via plans of reorganization that strip those liens.

To avoid undervaluation at a sale free of liens under either § 363 or § 1129, a secured creditor has the option of bidding its debt. *See* 7 *Collier* ¶ 1129.04[2][b][ii], at 1129-125. Indeed, while many of the valuation mechanisms (such as judicial valuation or market auction) may theoretically result in a perfect valuation, Congress has provided the credit bid mechanism as insurance for secured creditors to protect against

an undervaluation of assets sold.[18]  Secured creditors who believe their collateral is being sold for too low a price may bid it higher and use as credit the dollars they have already extended (together with interest and other secured costs) to debtors.  The

---

[18] To support its interpretation, the majority notes that § 363(k) is the "most obvious example . . . under which the right to credit bid is not absolute."  Maj. Op. at 39–40.  My colleagues argue that because "[a] court may deny a lender the right to credit bid in the interest of any policy advanced in the Code" through § 363(k)'s "for cause" exception, *id.* at 40 n.14, clause (iii) must be available as well to circumvent the credit bid requirements of clause (ii).  This thought-track is twisted.

Whereas the default rule under clause (ii), as the majority must concede, is presumptively to allow credit bidding "unless the court for cause orders otherwise," 11 U.S.C. § 363(k), the majority's approach allows the debtor to decide unilaterally to deny credit bidding, with only a belated court inquiry at confirmation to determine whether the denial of credit bidding was "fair and equitable" to the secured lenders.  The burden to show cause that Congress carefully placed on the debtor through clause (ii) has been shifted to the creditors through my colleagues' interpretation of clause (iii).  See Maj. Op. at 41 ("[A] lender can still object to plan confirmation on a variety of bases, including that the absence of a credit bid did not provide it with the 'indubitable equivalent' of its collateral.").  To be sure, the "fair and equitable" test at confirmation will be formidable, but the majority implicitly presumes the propriety of denying credit bidding instead of presuming the right to credit bid.

34

benefit to debtors is that every additional dollar of value realized by sale of the collateral is one less dollar that needs to come out of the rest of the bankruptcy estate. This effect is evidence of Congress's intent to protect secured creditors and maximize recovery at any sale free of liens, under the plan or under § 363, through § 363(k)'s credit bidding requirement. It also supports the reading of exclusivity for clause (ii).

### 3. Section 1111(b)

Section 1111(b)[19] is another path by which secured

---

[19] Section 1111(b) reads as follows:

(1)

(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

35

creditors may protect themselves, this time from undervaluation of the collateral securing their claims when the collateral is *not* sold. Its protections have two facets. First, it allows a non-

> > (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.
>
> > (B) A class of claims may not elect application of paragraph (2) of this subsection if—
>
> > > (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
> >
> > > (ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.
>
> (2)    If such an election is made, then notwithstanding section 506 (a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b).

36

recourse secured creditor to be treated as a creditor with recourse against the debtor for any debt deficiency that exists because the collateral is worth less than the debt it secures. 11 U.S.C. § 1111(b)(1)(A); *see also* 7 *Collier* ¶ 1111.03[1][a][ii][B] at 1111-16 to -17. Second, it allows a secured creditor to forgo that deficiency claim and instead elect to have its claim treated as if it were fully secured. 11 U.S.C. § 1111(b)(2); *see also* 7 *Collier* ¶ 1111.03[2][a] at 1111-22. Like the credit bidding provided for in § 363(k), this election provision helps to minimize the deficiency claims that can be asserted against the rest of the bankruptcy estate and other unencumbered assets, maximizing recovery for all creditors.

A § 1111(b) election is not available to a secured creditor, however, if it is a recourse creditor and the property securing the lien is to be sold "under section 363 of [the Code] or . . . under the plan," 11 U.S.C. § 1111(b)(1)(B)(ii). Thus, while not directly referencing § 1129(b)(2)(A) in the text of the former provision, it does make direct reference to the sale of property under a plan, an act specifically contemplated by § 1129(b)(2)(A). Sections § 1129(b)(2)(A)(ii) and 1111(b) are thus best understood as alternative protections for the secured creditor: one to apply when its collateral is sold free and clear of liens, and the other to apply when its collateral is treated other than as a sale.[20]

---

[20] This is not to say that the two clauses cover all scenarios. Though not in play here, when collateral is sold *subject to the*

As the two protections are opposite sides of the same coin, both focused on protecting the secured creditor's interest in property ordinarily protected under nonbankruptcy law from being undervalued, this suggests that Congress intended to channel all plan sales free of liens through § 1129(b)(2)(A)(ii). *See* Klee, *supra*, at 153 n.127 ("The collateral will be sold under . . . § 363(k) or under the plan. In either event the recourse lender has a right to bid at the sale [free of liens] and to offset his full allowed claim against the purchase price."); *see also* Brubaker, *supra*, at 11 ("Thus the protection against being cashed out at an unfairly low valuation that the § 1111(b)(2) election provides is, in the event of a sale of the collateral [free of liens], provided instead by the right to credit bid at the sale."). If plan sales free of liens were permitted outside of clause (ii), the secured creditor would not only lose the undervaluation protection afforded in non-plan-sale situations, but it would lose the only undervaluation protection Congress provided and considered in the sale-free-of-liens scenario.

---

*original lien*, § 1129(b)(2)(A)(ii) does not apply because the sale is not free and clear of all liens, while § 1111(b) does not apply because the collateral nonetheless is sold. Because this scenario falls squarely under § 1129(b)(2)(A)(i), a clause not implicated in this case, and its associated protections, I do not address it here. Likewise, when collateral is sold *subject to a replacement lien*, § 1129(b)(2)(A)(ii) does not apply, but that scenario falls under § 1129(b)(2)(A)(iii) and the "indubitable equivalent" language.

\* \* \* \* \*

Considering § 1129(b)(2)(A) in conjunction with §§ 363(k), 1111(b), and 1123(a)(5)(D), their text expresses the overall policy of Congress with respect to secured creditors whose collateral is to be sold free of liens. They are part of a comprehensive arrangement enacted by Congress to avoid the pitfalls of undervaluation, regardless of the mechanism chosen, and thereby ensure that the rights of secured creditors are protected while maximizing the value of the collateral to the estate and minimizing deficiency claims against other unencumbered assets. Taken as a whole, the Code supports the reading that funnels all plan sales free of liens into clause (ii). *See* Klee, *supra*, at 155 n.136 ("If the collateral is sold free and clear of the lien, then . . . § 1129(b)(2)(A)(ii) is the controlling provision."). This is the only reading that "produces a substantive effect . . . compatible with the rest of the law." *Timbers*, 484 U.S. at 371.

## C. Legislative history, at the right time, gives keys to comprehension of statutes.

Some may think that seeking to know laws by their legislative history is simply shading their shadows, resulting in ever more confusion. But when there is no consensus about what a law means, we ignore at our peril statements of intent put out by the branch of government that drafted that law. *See Blum*, 465 U.S. at 896 ("Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress,

39

we look first to the statutory language and then to the legislative history if the statutory language is unclear."); *In re Mehta*, 310 F.3d 308, 311 (3d Cir. 2002) (same).  I thus turn to legislative history.

Section 1129(b) was new to bankruptcy law when the Bankruptcy Code was enacted in 1978.  *See* 124 Cong. Rec. 31,795, 32,406 (1978) (statement of Rep. Edwards)[21] *reprinted in* 1978 U.S.C.C.A.N. 6436, 6474; *see also* Klee, *supra*, at 143 & n.82 ("[T]he test for secured claims [under § 1129(b)(2)(A)] is completely novel, affording protection for classes of secured claims that is not provided under present law."); *see also Ron Pair*, 489 U.S. at 240 ("[Congress] intended 'significant changes from current law in . . . the treatment of secured creditors and secured claims.'") (citations omitted).  This new section was not enacted in isolation, but was instead enacted in conjunction with section 1111(b):

Together with section 1111(b) . . . , this section

---

[21] In the specific case of the Bankruptcy Code, the Supreme Court "ha[s] treated [Rep. Edwards's] floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent," *Begier v. IRS*, 496 U.S. 53, 64 n.5 (1990), and most cases interpreting § 1129(b)(2)(A) have referred to those statements, as has *Collier*.  *See, e.g.*, *In re SunCruz Casinos, LLC*, 298 B.R. at 839; *In re Kent Terminal Corp.*, 166 B.R. at 565; *In re 222 Liberty Assocs.*, 108 B.R. 971, 977–78 (Bankr. E.D. Pa. 1990); 7 *Collier* ¶ 1129.04[1] n.1, at 1129-119.

[1129(b)] provides when a plan may be confirmed notwithstanding the failure of an impaired class to accept the plan under section 1129(a)(8). Before discussing section 1129(b)[,] an understanding of section 1111(b) is necessary.

124 Cong. Rec. at 32,406. Accordingly, it is necessary to read § 1129(b)(2)(A) not in isolation, but (as noted above) as a complement to § 1111(b). The latter was drafted with § 1129(b)'s operation in mind: "Sale of property under section 363 or *under the plan* is excluded from treatment under section 1111(b) *because of* the secured party's right to bid in the full amount of his allowed claim at any sale of the collateral under section 363(k) . . . ." *Id.* at 32,407 (emphases added). Those who drafted the Bankruptcy Code tell us straight out that subsection 1129(b)'s operation contemplates credit bidding for sales "under the plan."

Not only was § 1129(b) a new provision, it signaled a change from prior practice. The prior Bankruptcy Act only required "adequate protection"—such as court determination of fair market value of collateral after its appraisal and payment in cash of the appraised amount—to confirm a plan over the dissent of a secured creditor. *See* Klee, *supra*, at 143 & n.83 (citing to numerous provisions of the Bankruptcy Act). Instead of the court-determined standard of the prior Bankruptcy Act, the Bankruptcy Code created stronger creditor safeguards and protections in § 1129(b)(2)(A). Part of this protection was the ability of secured creditors to credit bid at any sale of collateral

41

free of liens.

In this context, it would be anomalous for Congress to draft a specific provision, clause (ii), providing protections above and beyond those given to secured creditors under the prior Bankruptcy Act, only to allow clause (iii) to be used to circumvent those protections and return to the precise mechanism used prior to the Code. We have "been admonished not to 'read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure,'" *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 211 (3d Cir. 2001) (citation omitted). I thus also do not presume that Congress enacted a nullity when it changed prior practice by enacting a statutory provision.

The legislative history provides examples of the types of situations in which clauses (ii) and (iii) would apply. Notably, clause (ii) was termed "*self-explanatory*." 124 Cong. Rec. at 32,407 (emphasis added). It allows confirmation of a plan when the "plan *proposes* to sell the property free and clear of the secured party's lien." *Id.* (emphasis added).

The legislative history also provides two examples where a court could confirm under clause (iii)—"[a]bandonment of the collateral to the creditor" and "a lien on similar collateral." *Id.* While it notes that an immediate cash payment less than the secured claim would not satisfy the requirement, *id.*, presumably an immediate cash payment equal to the secured claim would. What it does not say is that a *sale* of collateral free and clear of

42

liens can be accomplished through clause (iii); indeed, the only example mentioned of sales free and clear of liens is through clause (ii).

In enacting the Code to provide enhanced protections to secured creditors, Congress only contemplated sales through the "self-explanatory" procedures of clause (ii), not clause (iii), as the latter was intended for situations of abandonment or substitute collateral. Thus, I believe it is inconsistent with the entirety of § 1129(b)(2)(A) to allow plan sales free of liens through clause (iii).

**IV.**   **The Consequences of Applying Clause (iii) to Plan Sales Free of Liens Are Contrary to the Settled Expectations of Debtors and Lenders Bargaining in the Shadow of the Bankruptcy Code.**

If the debtors here prevail, a direct consequence is that debtors generally would pursue confirmation under clause (ii) only if they somehow concluded that providing a right to credit bid as required by that clause would be more advantageous to them than denying that right. This is illogical when one considers that credit bidding is a form of protection for the secured creditor, not the debtor. In our case, the secured lenders are owed over $300 million secured by substantially all of the debtors' assets. Instead of allowing the lenders their presumptive right to credit bid, debtors wish to confirm a plan that sells the collateral without the procedural safeguard against undervaluation contemplated by the Code's drafters. Any

43

undervaluation of the collateral does not benefit the secured lenders here, as they only receive the sale proceeds plus a building encumbered by a two-year, *rent-free* lease (chutzpah to the core). It does not even benefit the unsecured creditors, as their recovery is independent of the sale price. The only party that stands to benefit from any undervaluation is the purchaser of the assets, ostensibly the Stalking Horse Bidder with substantial insider and equity ties.

Moreover, this is not the "loan-to-own" scenario that was mentioned by debtors' counsel at oral argument. *See* Oral Arg. Tr. 42:10–19. In that situation, the "lender's primary incentive is acquiring the debtor's assets as cheaply as possible rather than maximizing the recovery on its secured loan." Brubaker, *supra*, at 12. By contrast, in our case the secured lenders have already loaned hundreds of millions of dollars in an arms-length transaction, and there is no plausible assertion that this was an attempt to "acquir[e] the debtor's assets as cheaply as possible." *Id.* The Stalking Horse Bidder's bid is only expected to yield gross proceeds to the estate of approximately $41 million. *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 554 (E.D. Pa. 2009) ("The Plan contemplates that the Stalking Horse Bidder will pay a cash purchase price of $30 million, plus a combination of payment of certain expenses and assumption of liabilities that will yield gross proceeds to the Debtors' estates of approximately $41 million."). This is small fraction of the secured lenders' implied loan-to-own purchase price ($295 million initial loan plus interest and costs). A winning credit bid is hardly an acquisition "on the cheap."

44

If anything, this presents the opposite situation: the Stalking Horse Bidder appears to be attempting to acquire the debtor's assets as cheaply as possible by "seizing upon coordination difficulties inherent in the administration of a large syndicated loan that might actually prevent the multiple secured lenders from writing a check to themselves, in which case someone else is trying to acquire the debtor's assets on the cheap by preventing the secured lenders from credit bidding." Brubaker, *supra*, at 12. Such a result would undermine the Bankruptcy Code by skewing the incentives of the debtor to maximize benefits for insiders, not creditors.

Secured creditors "have lawfully bargained prepetition for unequal treatment" by obtaining a property interest in debtors' property. *In re Owens Corning*, 419 F.3d 195, 216 (3d Cir. 2005). However unfair the debtors believe the credit bid right to be, it is an important consequence of this lawful bargaining under the Bankruptcy Code.

The secured lenders relied on their ability to credit bid in extending credit to the debtors, reducing their costs and pricing in accordance with their bargain. "[S]ecured credit lowers the costs of lending transactions not only by increasing the strength of the lender's legal right to force the borrower to pay, but also . . . by limiting the borrower's ability to engage in conduct that lessens the likelihood of repayment." Ronald J. Mann, *Explaining the Pattern of Secured Credit*, 110 Harv. L. Rev. 625, 683 (1997). As discussed above, Congress has determined that credit bidding is necessary to ensure proper valuation of the

45

collateral at a sale free of liens. Denying secured creditors the right to credit bid in those cases allows debtors to lessen the likelihood of repayment of the full value of the collateral.

Instead of giving secured creditors the benefit of the bargain struck with debtors, the debtors' proposed reading uproots settled expectations of secured lending. Whereas a secured creditor ordinarily would be assured of (1) retaining its lien on collateral and a payment stream, (2) a sale of collateral free of its liens with a corresponding right to credit bid, or (3) equivalent substitute collateral or the ability to take abandoned collateral, there is now a new possibility: a sale free of its liens without a right to credit bid. Allowing this possibility (outside of the bargained-for loan) forces future secured creditors to adjust their pricing accordingly, potentially raising interest rates or reducing credit availability to account for the possibility of a sale without credit bidding. As noted, secured creditors are deprived of some of the presumed benefits associated with secured lending. The Bankruptcy Code does not intend this; it preserves the bargains for treatment made under state law unless a federal interest directs a different result. *Butner*, 440 U.S. at 55. I see no such interest here, and debtors have not advanced any federal interest supporting the consequences of their interpretation.

## V.    Conclusion

Section 1129(b)(2)(A) permits the cramdown of objections by secured creditors to plans of reorganization when

to do so is "fair and equitable."  To be fair and equitable, the Bankruptcy Code sets markers that must be met.  One (clause (ii)) is that sales of collateral free of secured creditors' liens come with a condition: those creditors have the right at the sale to bid up to the full amount of the credit they extended (absent cause to take away this right).  The text gives this specific right when collateral is sold free of liens, and the question for us is whether it can be disregarded by a general provision, nowhere mentioning sales of collateral, that allows secured creditors' plan objections to be overcome when the plan provides those creditors the "indubitable equivalent" of their claims.  I believe the answer is "No."

Allowing a plan sale free of liens under the general provision (clause (iii)) is not implausible were we to make the "or" between clause (ii) and clause (iii) a textual show-stopper. But that would make us the standard-bearers of a purism that here would ignore an equally, I suggest more, plausible reading that plan sales of collateral are confined specifically either to clause (i) (sales subject to liens) or clause (ii) (sales free of liens).

Two plausible readings point me to those signposts a court can fix on to wend its way to what Congress intended. Each signpost—be it a canon of construction, the design and function of the Bankruptcy Code, every signal of intent contained in the legislative record, and commentary made by those with the power of the pencil who were present at the Code's creation—steers me to a reading that clause (ii) covers

47

exclusively plan sales of assets free of liens. (In effect, a single "or" becomes the bell, book, and candle that excommunicates congressional intent from the Bankruptcy Code.) Moreover, the consequences of a contrary reading include upsetting three decades of secured creditors' expectations, thus increasing the cost of credit.

I conclude that Congress intended to protect secured creditors at a plan sale of collateral free of liens by providing them a means to control undervaluations of secured assets. Accordingly, I would hold that § 1129(b)(2)(A)(ii) is exclusively applicable to the proposed plan sale in this case, and with it comes a presumptive right to credit bid by the secured lenders. The debtors of course would remain free to argue in the Bankruptcy Court that there is cause to preclude credit bidding under § 363(k) or propose an alternative plan under clause (i) or (iii) of § 1129(b)(2)(A) that does not involve the sale of property free of liens.[22]

---

[22] In any event, I do not take the majority opinion to preclude the Bankruptcy Court from finding, as a factual matter, that the debtors' plan is a thinly veiled way for insiders to retain control of an insolvent company minus the debt burden the insiders incurred in the first place. Nor do I take the majority opinion to preclude the Bankruptcy Court from concluding, at the confirmation hearing, that the plan (and resulting proposed sale of assets free of liens and without credit bidding) does not meet the overarching "fair and equitable" requirement.

Because I believe the Bankruptcy Code requires all cramdown plan sales free of liens to be channeled through § 1129(b)(2)(A)(ii), I respectfully dissent.